UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NATIONAL ARBOR DAY FOUNDATION,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*,<br><br>*Defendants*. | Civ. A. No. 26-1732 (CRC) |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


Table of Authorities ........ ii

Background ........ 3

I. Legal Framework for Terminating Grants. ........ 3

II. Factual Allegations ........ 5

A. The Cooperative Agreement between USFS and Arbor Day ........ 5

B. De-Obligation of Grant Funds ........ 7

C. Procedural History of This Case ........ 8

Legal Standard ........ 9

Argument ........ 10

I. The Court Lacks Subject-Matter Jurisdiction to Grant the Monetary Relief Plaintiff Seeks. ........ 10

A. Plaintiff Cannot Establish a Waiver of Sovereign Immunity. ........ 11

B. Plaintiff's Claims Are Essentially Contractual. ........ 12

II. This Court Cannot Enforce a Contractual Obligation of Money. ........ 17

III. Plaintiff is Unlikely to Succeed on the Merits. ........ 18

A. Plaintiff's APA Claims Fails. ........ 18

B. Plaintiff's Constitutional Claims Fails. ........ 20

IV. Plaintiff Has Not Failed to Demonstrate Irreparable Harm. ........ 24

V. The Balance of the Equities and the Public Interest Weigh Against Granting Preliminary Relief. ........ 27

VI. Any Preliminary Injunction Should Be Stayed. ........ 28

VII. The Court Should Order that Plaintiff Post a Bond as a Condition of Preliminary Relief. ........ 28

Conclusion ........ 30

# TABLE OF AUTHORITIES

Page(s)

Cases

*Am. Ass'n of Physics Teachers, Inc. v. Nat'l Sci. Found.*,
--- F. Supp. 3d ---, Civ. A. No. 25-1932 (JMC), 2025 WL 2615054,
(D.D.C. Sep. 10, 2025) ........ 11, 13
*Amica Ctr. for Immigrant Rts. v. U.S. Dep't of Just.*,
No. CV 25-298 (RDM), 2025 WL 1852762 (D.D.C. July 6, 2025) ........ 21
*NIH v. Am. Pub. Health Ass'n ("APHA")*,
145 S. Ct. 2658 (2025) ........ 12, 13, 16
*Arbaugh v. Y&H Corp.*,
546 U.S. 500 (2006) ........ 10, 20
*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ........ 20
*Aviles-Wynkoop v. Neal*,
978 F. Supp. 2d 15 (D.D.C. 2013) ........ 25
*Bd. of Regents of State Colls. v. Roth*,
408 U.S. 564 (1972) ........ 22
*Benisek v. Lamone*,
585 U.S. 155 (2018) ........ 10
*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ........ 14, 15, 16
*Chaplaincy of Full Gospel Churches*,
454 F.3d 290 (D.C. Cir. 2006) ........ 24
*City of Houston, Tex. v. Dep't of Hous. & Urb. Dev.*,
24 F.3d 1421 (D.C. Cir. 1994) ........ 17
*CityFed Fin. Corp. v. Off. of Thrift Supervision*,
58 F.3d 738 (D.C. Cir. 1995) ........ 10
*Clark v. Libr. of Cong.*,
750 F.2d 89 (D.C. Cir. 1984) ........ 11
*Clevinger v. Advoc. Holdings, Inc.*,
134 F.4th 1230 (D.C. Cir. 2024) ........ 25
*Consol. Edison Co. of New York v. U.S., Dep't of Energy*,
247 F.3d 1378, 1385-86 (Fed. Cir. 2001) ........ 21
*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022) ........ 13
*Ctr. for Biological Diversity v. Trump*,
453 F. Supp. 3d 11 (D.D.C. 2020) ........ 21
*Dallas County, Texas, v. Kennedy*,
No. 25-CV-4242 (CRC), 2026 WL 2123225 (D.D.C. July 23, 2026) ........ passim
*Dalton v. Specter*,
511 U.S. 462 (1994) ........ 21
*Damus v. Nielsen*,
313 F. Supp. 3d 317 (D.D.C. 2018) ........ 9

*Davis v. Pension Ben. Guar. Corp.*,
571 F.3d 1288 (D.C. Cir. 2009) ........ 9
*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
601 U.S. 42 (2024) ........ 11
*Dep't of Educ. v. California*,
604 U.S. 650 (2025) ........ 12, 13, 16
*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ........ 24
*FDIC v. Meyer*,
510 U.S. 471 (1994) ........ 20
*Goldberg v. Kelly*,
397 U.S. 254 (1970) ........ 22
*Grayned v. City of Rockford,*
408 U.S. 104 (1972) ........ 24
*Great-West Life & Annuity Insurance Co. v. Knudson*,
534 U.S. 204 (2002) ........ 14, 15, 16
*Heckler v. Chaney*,
470 U.S. 821 (1985) ........ 28
*Huisha-Huisha v. Mayorkas*,
27 F.4th 718 (D.C. Cir. 2022) ........ 10
*Ingersoll-Rand Co. v. United States*,
780 F.2d 74 (D.C. Cir. 1985) ........ 12, 13
*Int'l Eng'g Co., Div. of A-T-O, Inc. v. Richardson*,
512 F.2d 573 (D.C. Cir. 1975) ........ 12
*Iron Arrow Honor Soc'y v. Heckler*,
464 U.S. 67 (1983) ........ 17
*Johnson v. Panetta*,
953 F. Supp. 2d 244 (D.D.C. 2013) ........ 20
*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) ........ 23
*Kim v. FINRA*,
698 F. Supp. 3d 147 (D.D.C. 2023) ........ 27
*Kimel v. Florida Bd. of Regents*,
528 U.S. 62 (2000) ........ 11
*Larson v. Domestic & Foreign Commerce Corp.*,
337 U.S. 682 (1949) ........ 23
*Make the Road N.Y. v. Mullin*,
--- F.4th. ---, 2026 WL 1792978 (D.C. Cir. Jun. 23, 2026) ........ 9
*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) ........ 12, 13, 16, 17
*Mullin v. Doe*,
609 U.S. ___, 2026 WL 1825840 (U.S. Jun. 26, 2026) ........ 10
*Nat'l Assoc. of Regional Councils v. Costle*,
564 F.2d 583 (D.C. Cir. 1977) ........ 17
*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) ........ 24

*Nat'l Urban League v. Trump*,
--- F. Supp. 3d ---, Civ. A. No. 25-0471 (TJK), 2025 WL 1275613, at *17 (D.D.C. May 2, 2025) .......... 22
*Nken v. Holder*,
556 U.S. 418 (2009) .......... 9, 27
*Off. of Pers. Mgmt. v. Richmond*,
496 U.S. 414 (1990) .......... 18
*Perry v. Sindermann*,
408 U.S. 593 (1972) .......... 22
*Raines v. Dep't of Just.*,
424 F. Supp. 2d 60 (D.D.C. 2006) .......... 20
*Richards v. Delta Air Lines, Inc.*,
453 F.3d 525 (D.C. Cir. 2006) .......... 16
*Robinson v. Farley*,
364 F. Supp. 3d 154 (D.D.C. 2017) .......... 19
*Rochester Pure Waters Dist. v. EPA*,
960 F.2d 180 (D.C. Cir. 1992) .......... 17
*Sessions v. Dimaya*,
584 U.S. 148 (2018) .......... 23
*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) .......... 9
*Singh v. Carter*,
185 F. Supp. 3d 11 (D.D.C. 2016) .......... 9
*Spectrum Leasing Corp. v. United States*,
764 F.2d 891 (D.C. Cir. 1985) .......... 11, 13
*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024) .......... 9
*Suburban Mortg. Assocs., Inc. v. Dep't of Hous. & Urb. Dev.*,
480 F.3d 1116 (Fed. Cir. 2007) .......... 13
*Town of Castle Rock v. Gonzalez*,
545 U.S. 748 (2005) .......... 22
*United States Ass'n of Reptile Keepers, Inc. v. Zinke*,
852 F.3d 1131 (D.C. Cir. 2017) .......... 9
*United States v. Testan*,
424 U.S. 392 (1976) .......... 11
*Vera Inst. of Just. v. Dep't of Just.*,
--- F. Supp. 3d ---, Civ. A. No. 25-1643 (APM),
2025 WL 1865160, at *12 (D.D.C. Jul. 7, 2025) .......... 11
*Veterans Command, LLC v. United States*,
Civ. A., No. 21-2018 (RJL), 2021 WL 4437694 (D.D.C. Sep. 14, 2021) .......... 14
*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 9
*Z St., Inc. v. Koskinen*,
44 F. Supp. 3d 48 (D.D.C. 2014) .......... 20

Statutes

5 U.S.C. § 706(2)(A) .......... 2, 18
16 U.S.C. § 2105(c) .......... 5
28 U.S.C. § 1491 .......... 1
Pub. L. 119-21 .......... 8
Public Law 117-169 .......... 8, 18

Rules

Fed. R. Civ. P. 65(c) .......... 28

Regulations

2 CFR § 200.340(a) .......... 3, 4, 7, 18, 19
2 CFR § 200.340(a)(1) .......... 2
2 CFR § 200.340(a)(4) .......... 4, 6, 19
2 CFR § 200.341 .......... 6

Other Authorities

85 Fed. Reg. .......... 4
89 Fed. Reg. .......... 4
Executive Order 14173 .......... 4, 18
Executive Order 14151 .......... 2, 4, 18, 19
Executive Order 14154 .......... 18

# INTRODUCTION

Defendants, United States Department of Agriculture ("USDA"), Brooke Rollins in her official capacity as Secretary of the United States Department of Agriculture, United States Forest Service ("USFS"), and Tom Schultz in his official capacity as Forest Service Chief, ("Defendants"), respectfully submit this opposition to Plaintiff National Arbor Day Foundation's ("Arbor Day" or "Plaintiff") Motion for Preliminary Injunction, ECF No. 8 ("Pl. Mot.") and ECF No. 8-1 ("Pl. Mem.").[1] For the following reasons, Plaintiff's motion should be denied.

*First,* Plaintiff contends that the Court has jurisdiction over this USDA grant termination case. Defendants disagree. While the Parties have preliminarily briefed the issue of jurisdiction in Defendants' motion to stay the case, which the Court denied, the government maintains that under the Tucker Act, at 28 U.S.C. § 1491, the Court of Federal Claims has subject matter jurisdiction over this case because Plaintiff seeks, in part, an order requiring Defendants "to return to the status quo," as to the Cooperative Agreement that granted federal monies to Arbor Day, which would include "the *restoration of all funding and the resumption of all performance obligations*" under the Cooperative Agreement. Complaint, ECF No. 5-1 ("Compl.") at 28. *See also* generally, Def. Mot. to Stay, ECF No. 14 ("Def. MTS"); Def. Reply, ECF No. 28; and Pl. Mem. at 22-28. Without the grant monies, Plaintiff contends that Arbor Day and 47 grant subrecipients and municipalities do not have funds to conduct its tree planting and maintenance activities in at least eight U.S. states. Compl. ¶¶ 88-89. Hence, the relief Plaintiff seeks is indeed a request for federal dollars – the remaining part of a $75,000,000 grant. Compl. ¶ 34.

---

[1] Citations are to the ECF-generated page numbers, appearing in blue color at the top right corner of each page.

*Second*, if the Court has jurisdiction over this matter, which Defendants do not concede, the Administrative Procedure Act's (APA) limited waiver of sovereign immunity does not extend to orders to enforce a contractual obligation of money – which is exactly what the Plaintiff is requesting. In fact, it is doubtful that the Court has authority to issue the remedy requested by Plaintiff due to Congress's rescission of the money that originally funded the subject grant award.

*Third*, should the Court find that it has jurisdiction, which Defendants do not concede, Plaintiff fails to show how it will succeed on the merits of its seven causes of actions in this case and, as such, should not be granted a preliminary injunction. In its Complaint, Plaintiff asserts that USDA's termination of the subject grant violated the APA, specifically 5 U.S.C. § 706(2)(A) (Counts I-III) on the basis that the decision was a final agency action not in accordance with law and regulations, specifically 2 CFR § 200.340(a)(1), the Cooperative Forestry Assistance Act of 1978 ("CFAA"), and the Inflation Reduction Act of 2022 ("IRA"); and that it was an arbitrary and capricious decision. Compl. ¶¶ 94-126. Plaintiff also raises constitutional violations (Counts IV-VII), to include separation of powers, under Article I, § 1 of the U.S. Constitution; an *ultra vires* claim; violation of procedural due process under the Fifth Amendment of the U.S. Constitution; and a constitutional void for vagueness argument. Compl. ¶¶ 127-159. However, Defendants properly terminated the subject grant under the applicable law and in accordance with Executive Orders 14151 and 14173, such that Defendants did not violate the APA, did not violate the CFAA and IRA statutes, did not cause injury to Plaintiff's procedural due process rights, and did not commit any acts that were *ultra vires* or against the separation of powers.

*Fourth*, Plaintiff has entirely failed to establish irreparable harm, relying wholly on theoretical and conclusory statements. At most, Plaintiff states that Arbor Day and 47 grant subrecipients and municipalities do not have funds to conduct its tree planting and maintenance

activities in at least eight U.S. states. Compl. ¶¶ 88-93. Plaintiff contends that it has diverted its own time and resources "from its own mission and other critical projects" (Compl. ¶ 91) and suffered "significant reputational harm and competitive prejudice" (Pl. Mem. at 44) – but there is no support at all for these theoretical and conclusory statements. Even if Plaintiff demonstrated actual harm resulting from the grant termination, Plaintiff fails to show how or why it is imminent. This is so, especially when Plaintiff waited 13 months after the termination to file suit.

*Finally*, the balance of equities and public interest do not tip in favor of the Court issuing a preliminary injunction, and Plaintiff provides little to no support for its argument. Pl. Mem. at 46-48. The government and the public have a strong interest in allowing the Department to review existing grants–which are funded by taxpayer dollars–and make a decision to terminate grants that do not align with the Department's priorities and goals.

Because Plaintiff has failed to present an adequate and persuasive case for a preliminary injunction, Defendants respectfully request that the Court deny Plaintiff's Motion for a Preliminary Injunction.

## BACKGROUND

### I. <u>Legal Framework for Terminating Grants.</u>

Under 2 CFR § 200.340(a), a "Federal award may be terminated in part or its entirety" for reasons stated in subparts (1) through (4). Subpart (4) states that termination may occur if, "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law . . . an award no longer effectuates the program goals or agency priorities." This regulation had changed in 2020 in order to

> strengthen the ability of the Federal awarding agency to terminate Federal awards, to the greatest extent authorized by law, when the Federal award no longer effectuates the program goals or Federal awarding agency priorities. . . . The intent of this change is to ensure that Federal awarding agencies prioritize ongoing support to Federal awards that meet program goals. For instance, following the

> issuance of a Federal award, if additional evidence reveals that a specific award objective is ineffective at achieving program goals, it may be in the government's interest to terminate the Federal award.

*Guidance for Grants and Agreements*, 85 Fed. Reg. 49,506, 49,509 (Aug. 13, 2020).

In 2024, the Office of Management and Budget relocated the relevant language to 2 CFR § 200.340(a)(4). *See Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30,046, 30,089 (Apr. 22, 2024). While commenters complained that the rule gave too much authority to agencies to terminate grants, the Office of Management and Budget maintained the authority to terminate grants that no longer effectuate agency priorities so long as notice of that authority is in the grant: "Provided that the language is included in the terms and condition of the award, the revised termination provision at section 200.340 continues to allow Federal agencies and pass-through entities with authority to terminate an award in the circumstances described in paragraph (a)(2) in the prior version of the guidance." *Id.* at 30,089–90; *see also Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30,046; 2 CFR § 200.211(c)(1)(v) ("Federal agencies must inform recipients of the termination provisions in § 200.340, including the applicable termination provisions in the Federal agency's regulations or terms and conditions of the Federal award.").

Upon taking office on January 20, 2025, President Donald Trump issued a series of executive orders (EOs) seeking to align the government's grant programs with his agenda. In the *Ending Radical and Wasteful Government DEI Programs and Preferencing* EO, Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 29, 2025), the President declared that "illegal and immoral discrimination programs" were implemented under the name "diversity, equity, and inclusion (DEI)." § 1. The President further declared that "Americans deserve a government committed to serving every person with equal dignity and respect, and to expending precious taxpayer resources only on making America great." *Id.* In the *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* EO, Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 31, 2025), the President

wrote, "[t]he Federal Government is charged with enforcing our civil-rights laws. The purpose of this order is to ensure that it does so by ending illegal preferences and discrimination." § 1. USDA subsequently began a review of Federal financial assistance awards to ensure consistency with those policies. (Although Plaintiff, in its brief, refers to Executive Orders No. 14154 (Pl. Mem. at 17), that EO is inapplicable here because USDA did not terminate the subject grant per that Executive Order.)

## II. <u>Factual Allegations</u>

### A. The Cooperative Agreement between USFS and Arbor Day

On December 18, 2023, USFS (an agency of USDA) entered into a Cooperative Agreement with Arbor Day, designated as Award No. 24-CA-11132544-015 ("Cooperative Agreement," "the grant," or "subject grant"). Compl. ¶ 34; Donahoo Declaration, ECF No. 8-2 ¶ 6 ("Donahoo Decl."). The subject grant was initially awarded in the amount of $50,000,000 under the authority of the CFAA, 16 U.S.C. § 2105(c), and the IRA, § 23003(a)(2), then subsequently modified for a total value of $75,000,000. Pl. Mem., Ex. B, ECF No. 8-2 at 18-60 (Cooperative Agreement); Ex. H, ECF No. 8-2 at 78-90 (Modification). *See* Compl. ¶¶ 34-35; Donahoo Decl. ¶¶ 7-8. The performance of the grant was from December 18, 2023, through November 30, 2028, until it was terminated on February 14, 2025. Compl. ¶¶ 34-36.

The grant funded programs by Arbor Day, which focused on planning and maintaining urban forests. Compl. ¶¶ 37-39. Plaintiff states that the terms of the grant required "Arbor Day to administer subawards to [47] sub-recipients identified in the Project Narrative, with more than $28,000,000 passed through to predetermined municipalities" in at least eight different U.S. states. Compl. ¶ 37.

Plaintiff describes the programs funded by the grant as "focused exclusively on planting and maintaining healthy urban forests. Specific activities include abatement of hazard trees, urban

reforestation, canopy management and resilience, and dead tree removal," and "capture stormwater and replenish groundwater, help clean the air, and help cool air and surfaces in urban areas during heat waves." Donahoo Decl. ¶¶ 16-17. Such actions "serves these purposes for all." *Id.* ¶ 17.

However, the subject Cooperative Agreement specifically aimed to "address . . . race-related inequities . . . in disadvantaged communities across the United States." Pl. Mem., Ex. B, ECF 8-2 at 43. Grounded in the Justice40 Initiative, Plaintiff's goal was to "address systemic racial . . . inequities" through a subaward program "focused entirely on disadvantaged communities." *Id.* at 44. All of this was to support, in part, "equitable access to canopy" and to ensure "all work directly impacts communities defined as disadvantaged." *Id.* at 44, 49.

USFS notified Arbor Day by letter dated February 14, 2025, that the subject grant would be terminated. Compl. ¶ 61; Donahoo Decl. ¶ 22. In the letter, USFS stated,

> Pursuant to 2 CFR § 200.341 this letter serves as written notification that the subject agreement between the USDA Forest Service and the National Arbor Day Foundation (Recipient) is terminated as of the date of this notice, in accordance with 2 CFR § 200.340(a)(4) and the terms and conditions of the award. The USDA Forest Service has determined that award 24-CA-11132544-015 no longer effectuates agency priorities regarding diversity, equity, and inclusion programs and activities.

Pl. Mem., Ex. A, ECF No. 8-2 at 15 (USFS Termination Letter dated Feb. 14, 2025).

On March 11, 2025, Arbor Day wrote to USFS to dispute the termination of the grant and request its reinstatement, as well as engagement in Alternative Dispute Resolution. Pl. Mem., Ex. C, ECF No. 8-2 at 61-63 (Arbor Day Dispute Letter dated March 11, 2025).

Then, on September 10, 2025, counsel for Arbor Day wrote to USFS and made the same requests to USFS as Arbor Day did. Pl. Mem., Ex. D, ECF No. 8-2 at 66-68 (Megan Wright Letter dated Sept. 10, 2025). Arbor Day's counsel anchored its request to the decision in *Urban Sustainability Directors Network v. USDA*, No. 25-1774 (D.C.C.), referring to Arbor Day as "very

similarly situated" as the plaintiff in *Urban Sustainability*. Pl. Mem., Ex. D, ECF No. 8-2 at 66. There, Arbor Day's counsel further stated that,

> the termination of [Arbor Day's] grant forced the cancellation of all of these pass-through awards causing irreparable harm to [Arbor Day] and its subawardees. Like [plaintiff in *Urban Sustainability*], [Arbor Day's] reputation as a reliable partner to other organization has been harmed, and its subawardees are unable to fulfill the goals the grant funding would have met.

Pl. Mem. Ex. D at 67-68.

On September 29, 2025, USFS acknowledged Arbor Day's counsel's letter, indicating that the government is reviewing the impact of *Urban Sustainability*. Pl. Mem., Ex. E, ECF No. 8-2 at 70 (USFS Letter dated Sept. 29, 2025). Arbor Day's counsel followed up with USFS on January 7, 2026, stating that Arbor Day "renews its demand" that USFS reconsider termination and immediately reinstate the Cooperative Agreement because the termination has "impacted municipalities and other nonprofit organizations" and the cancellation of the "pass-through awards caus[ed] irreparable harm to [Arbor Day] and its subawardees." Pl. Mem., Ex. F, ECF No. 8-2 at 73-74 (Megan Wright Letter dated Jan. 7, 2026). On January 28, 2026, USFS informed Arbor Day's counsel that, "after careful review," the *Urban Sustainability* decision "does not affect awards outside [of that] case." Pl. Mem., Ex. G, ECF No. 8-2 at 76 (USFS Letter dated Jan. 28, 2026). USFS stated, "[t]he termination of the cooperative agreement with the Arbor Day Foundation is final." *Id.*

**B. De-Obligation of Grant Funds**

As of the date of the grant termination, February 14, 2025, Arbor Day spent roughly $4,206,550.27 of the $75,000,000 award.[2]

[2] USASpending.gov, Grant Summary for Cooperative Agreement, No. 24CA11132544015, *$ Award Amounts – Outlayed Amount*, available online at

On July 4, 2025, the President signed into law the One Big Beautiful Bill Act ("OBBBA"), Pub. L. 119-21 (July 4, 2025). Section 10201(3) of OBBBA rescinded unobligated balances appropriated by Section 23003(a)(2) of Public Law 117-169, which was the source of funds for the Cooperative Agreement. On July 11, 2025, pursuant to the termination of the Cooperative Agreement, USFS de-obligated the approximately $65.7 million remaining balance on the award.[3] On September 21, 2025, OMB approved an apportionment rescinding balances in the account pursuant to the OBBBA rescission.[4] The funds were therefore conveyed back to the U.S. Department of Treasury.

### C. Procedural History of This Case

Accordingly, Plaintiff waited 13 months after the grant termination to file this suit. ECF No. 6 (Complaint filed May 22, 2026). On June 5, 2026, Plaintiff filed this motion for preliminary injunction. On June 10, 2026, Defendants moved to stay the motion or, alternatively, extend the time to respond to Plaintiff's motion (ECF No. 14), which Plaintiff opposed (ECF No. 26). On July 23, 2026, the Court denied the motion to stay and set a briefing schedule for the Parties' respective opposition and reply to Plaintiff's motion. Min Order, July 23, 2026.

---

[https://www.usaspending.gov/award/ASST_NON_24CA11132544015_012] (last visited August 6, 2026) (showing Outlayed Amount is $4.2 Million).

[3] USASpending.gov, Grant Summary for Cooperative Agreement, No. 24CA11132544015, *Transaction History – Modification No. 0004*, Action Date 07/11/2025, available online at [https://www.usaspending.gov/award/ASST_NON_24CA11132544015_012] (last visited August 6, 2026) (stating that "AWARD WAS TERMINATED AND $65,761,271.93 DE-COMMITTED FROM THE AWARD").

[4] FY 2025 Apportionment, State and Private Forestry (Sep. 21, 2025), https://apportionment-public.max.gov/Fiscal%20Year%202025/Department%20of%20Agriculture/Excel/FY2025_Agency%3DAG_Bureau%3DFOREST_TAFS%3D012-2022-2031-1105_Iteration%3D3_2025-09-21-17.14.xlsx

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). To obtain such emergency relief, the movant must show that (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Id.* The latter two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Supreme Court has held that at least the second factor—irreparable harm—must be likely and "not just a possibility." *Winter*, 555 U.S. at 20.

Before *Winter*, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another. *Damus v. Nielsen*, 313 F. Supp. 3d 317, 326 (D.D.C. 2018) (quoting *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009)). The D.C. Circuit has not had occasion to conclusively decide whether that sliding scale survives *Winter* and *Nken*. *Make the Road N.Y. v. Mullin*, --- F.4th. ---, 2026 WL 1792978, at *5 (D.C. Cir. Jun. 23, 2026). The Supreme Court has made clear, however, that "[t]he default rule is that a plaintiff seeking a preliminary injunction must make a clear showing" as to each *Winter* element. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024). Following *Winter*, courts have recognized that the sliding scale approach is no longer viable and that each of the factors is now an "independent, free-standing requirement." *Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011) (Kavanaugh, J., concurring); *see also Singh v. Carter*, 185 F. Supp. 3d 11, 16-17 (D.D.C. 2016) (sliding scale approach is "highly questionable," and a plaintiff "bears the burden of persuasion on all four preliminary injunction factors").

If the Court concludes that a claim fails as a matter of law, on a point of jurisdiction or merits, then a preliminary injunction is inappropriate. *See United States Ass'n of Reptile Keepers,*

*Inc. v. Zinke*, 852 F.3d 1131, 1135 (D.C. Cir. 2017). "So in evaluating the likelihood-of-success question for the purpose of ruling on a request for interim relief, courts may consider both the likelihood that they have jurisdiction and the likelihood that the claim will succeed on the merits," and, "[i]f they conclude that a claim fails on either ground, they must deny interim relief." *Mullin v. Doe*, 609 U.S. ___, 2026 WL 1825840, at *11 (U.S. Jun. 26, 2026) (plurality decision). Indeed, if the Court "concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

Because preliminary injunctions are not "awarded as of right," but "[a]s a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018). A showing of a strong likelihood of success on the merits can still lead to the denial of preliminary injunctive relief if the party fails to make a sufficient showing of irreparable injury. *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *see also Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) ("Because the Plaintiffs are likely to succeed on the merits of their § 1231 claims, we apply the other preliminary injunction factors to decide whether the Plaintiffs are entitled to relief on those claims").

## ARGUMENT

Plaintiff's motion should be denied for the following reasons.

### I. <u>The Court Lacks Subject-Matter Jurisdiction to Grant the Monetary Relief Plaintiff Seeks.</u>

By this motion for preliminary injunction, Plaintiff asks the Court to enjoin Defendants from maintaining or effectuating the grant termination and "ordering Defendants to return to the status quo, including the *restoration of all funding and the resumption of all performance obligations*." Pl. Mem. at 49. By this, Plaintiff is asking the Court to provide access to all of the

remaining funds in the $75,000,000 USDA grant.[5] In other words, Plaintiff wants the Court to turn on a faucet when the underlying plumbing has been removed.

**A. Plaintiff Cannot Establish a Waiver of Sovereign Immunity.**

This Court cannot grant the relief that Plaintiff seeks because "the United States, as a sovereign, is generally immune from suits seeking money damages . . . [unless] Congress [] choos[es] to waive that immunity." *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 48 (2024); *see also United States v. Testan*, 424 U.S. 392, 399 (1976); *Clark v. Libr. of Cong.*, 750 F.2d 89, 103 (D.C. Cir. 1984). A "waiver of sovereign immunity must be 'unmistakably clear in the language of the statute.'" *Kirtz*, 601 U.S. at 48 (quoting *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 76 (2000)). Plaintiff's request is "the classic contractual remedy of specific performance" and such relief can only be granted the Court of Federal Claims. *Vera Inst. of Just. v. Dep't of Just.*, --- F. Supp. 3d ---, Civ. A. No. 25-1643 (APM), 2025 WL 1865160, at *12 (D.D.C. Jul. 7, 2025) (quoting *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985)); *see also Am. Ass'n of Physics Teachers, Inc. v. Nat'l Sci. Found.*, --- F. Supp. 3d ---, Civ. A. No. 25-1932 (JMC), 2025 WL 2615054, at *9 (D.D.C. Sep. 10, 2025) ("While Plaintiffs do not ask for money damages, they nonetheless seek a contract-based remedy: specific performance.").

In its motion, Plaintiff argues that "the source of Arbor's Days' claims is not any purported contract but rather claims on the Constitution, federal regulations, and federal statutes" (Pl. Mem. at 23), while at the same time stating that 47 subrecipients of the grant's funds cannot continue its "tree planting and maintenance activities" in eight states without the grant's remaining funds.

[5] As explained above, Plaintiff spent $4,206,550.27 of the $75,000,000 award. USFS de-obligated the approximately $65.7 million remaining balance on the award, which has been returned to the Treasury.

Compl. ¶¶ 88-89. However, the Tucker Act channels suits like this for money damages from grant terminations to the Court of Federal Claims. *See Dep't of Educ. v. California*, 604 U.S. 650, 650 (2025) ("[T]he APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here. Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" (citation omitted)); *NIH v. Am. Pub. Health Ass'n ("APHA")*, 145 S. Ct. 2658, 2658 (2025) (similar). As a result, none of Plaintiff's APA claims (Counts I–III) nor its constitutional and statutory claims (Count IV-VII) can be the basis of a money damages award against the federal government, as such an award lies elsewhere.

### B. Plaintiff's Claims Are Essentially Contractual.

To determine whether district court jurisdiction is proper, the Court must assess whether the claims "are essentially contractual." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982). The Court must consider (1) whether "the source of the rights" asserted is contractual or is "based on truly independent legal grounds," and (2) "the type of relief sought" is of a contractual nature. *Id.* at 968–71. In applying this test, the Court must look past artful pleading because "a plaintiff whose claims against the United States are essentially contractual should not be allowed to avoid the jurisdictional (and hence remedial) restrictions of the Tucker Act by casting its pleadings in terms that would enable a district court to exercise jurisdiction under a separate statute and enlarged waivers of sovereign immunity, as under the APA." *Id.* at 967; *see also Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77–78 (D.C. Cir. 1985); *Int'l Eng'g Co., Div. of A-T-O, Inc. v. Richardson*, 512 F.2d 573, 580 (D.C. Cir. 1975). A straightforward *Megapulse* analysis establishes that Plaintiff's constitutional claims are contractual claims in disguise.

Here, under the first prong, "the source of the rights" asserted by Plaintiff is the grant agreements themselves, including the contractual termination clause in each agreement. In other

words, Plaintiff's asserted right to the funds here arises solely from the grant agreements and "in no sense . . . exist[s] independently of" those contracts. *Spectrum Leasing Corp.*, 764 F.2d at 894. Plaintiff would have no claim absent the grants and the government's alleged breach. *Megapulse*, 672 F.2d at 967–68. The source of the right asserted is therefore not "truly independent" of the contracts, or not "based on truly independent legal grounds." *Id.* at 970.

With respect to the second prong of *Megapulse,* the relief sought, at base, is payment of money. In seeking reinstatement of awards (*i.e.,* by setting aside their grant terminations), the "essence of [Plaintiffs'] claim is a request for specific performance of the original contract." *Ingersoll-Rand*, 780 F.2d at 79–80. This is a "typical contract remedy" that indicates a claim is "founded upon a contract for purposes of the Tucker Act." *Spectrum Leasing Corp*, 764 F.2d at 894-95. The payment of money, far from being merely incidental to or "hint[ed] at," is the principal object of their suit. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1112 (D.C. Cir. 2022). Plaintiff's "claim that a government agency has violated [its constitutional and statutory rights] by refusing performance under a contract is substantively indistinguishable from a breach of contract claim." *Suburban Mortg. Assocs., Inc. v. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1128 (Fed. Cir. 2007).

The Supreme Court's ruling in *APHA* confirms this. As in *APHA*, Plaintiff seeks adjudication of claims "'based on' the research-related grants." *APHA*, 145 S. Ct. at 2658 (quoting *California*, 604 U.S. at 651). As in *APHA*, Plaintiff asks for "relief designed to enforce [an] obligation to pay money pursuant to those grants." *Id.* (citation modified). Thus, as in *APHA*, "[t]he core of [Plaintiff's complaint] alleges that the Government unlawfully terminated their grants," so "th[is] is a breach of contract claim," that cannot be heard here. *Id.* at 2665 (Kavanaugh, J., concurring in part and dissenting in part); *see also Am. Ass'n of Physics Teachers,* 2025 WL

2615054, at *9-11; *Veterans Command, LLC v. United States*, Civ. A. No. 21-2018 (RJL), 2021 WL 4437694, at *2 (D.D.C. Sep. 14, 2021).

Plaintiff's reliance on *Bowen v. Massachusetts*, 487 U.S. 879 (1988), is unavailing. Pl. Mem. at 25-27. As an initial matter, this Court already has concluded that *Bowen* distinguishes between money damages, which are "given to the plaintiff to *substitute* for a suffered loss," and "specific remedies," such as specific performance, which "are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Am. Bar Ass'n v. U.S. Dep't of Just.*, 783 F. Supp. 3d 236, 244 (D.D.C. 2025). Moreover, *Bowen* states that "[d]amages are given to the plaintiff to substitute for a suffered loss, whereas specific remedies are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Bowen*, 487 U.S. at 895 (citation modified). Accordingly, *Bowen* reasoned, when money is the specific thing a plaintiff claims it is owed, rather than a mere substitute for a plaintiff's claimed loss, the plaintiff does not seek "money damages" within the APA's meaning, and the APA's sovereign immunity waiver thus applies. *Id.*

But that aspect of *Bowen* no longer is controlling in light of *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002), which expressly adopted Justice Scalia's dissent in *Bowen*. In *Bowen*, Justice Scalia argued that the majority's reason for concluding that the claims at issue did not seek money damages "is simply wrong." *Bowen*, 487 U.S. at 917 (Scalia, J., dissenting). Justice Scalia acknowledged that the claims "fit a general description of a suit for specific relief, since the award of money undoes a loss by giving respondent the very thing (money) to which it was legally entitled," but rejected the relevance of the specific versus substitute relief dichotomy on which the majority relied. *Id.* He explained that "damages" is a term of art that has "been used in the common law for centuries" and had a meaning "well established by tradition."

*Id.* "Part of that tradition," Justice Scalia wrote, "was that a suit seeking to recover a past due sum of money that does no more than compensate a plaintiff's loss is a suit for damages, not specific relief." *Id.* at 918.

Justice Scalia concluded by setting forth the following rule: "Almost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied." *Id.* at 918–19 (Scalia, J., dissenting). He identified only a single "rare" exception to this general rule, one that plainly does not encompass Plaintiff's suit here: suits "to prevent future losses that were either incalculable or would be greater than the sum awarded." *Id.* at 918.

Fourteen years later, the Supreme Court in *Knudson* directly quoted Justice Scalia's *Bowen* dissent and held that "[a]lmost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied." *Knudson*, 534 U.S. at 210 (quoting *Bowen*, 487 U.S. at 918–19 (Scalia, J., dissenting)). That is so because "[t]he 'substance' of a money judgment is a compelled transfer of money." *Id.* at 216.

*Knudson* therefore limited *Bowen* to cases that are "not merely for past due sums, but for an injunction to correct the method of calculating payments going forward." 534 U.S. at 212. In other words, *Knudson* explained, the APA waived sovereign immunity in *Bowen* not because the plaintiff sought specific rather than substitute monetary relief, but because the plaintiff sought prospective injunctive relief separate and apart from the sums of money it sought to compel the government to pay. *Id.*

After *Knudson*, the test no longer is whether a plaintiff seeks specific or substitute monetary relief. Now, all that matters is whether a suit "seek[s] . . . to compel the defendant to pay a sum of

money to the plaintiff." *Knudson*, 534 U.S. at 210 (quoting *Bowen*, 487 U.S. at 918-19 (Scalia, J., dissenting)); *see also Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 530–31 (D.C. Cir. 2006) (applying *Knudson* and explaining that "the rule has long been that '[a] plaintiff cannot transform a claim for damages into an equitable action by asking for an injunction that orders the payment of money[]'"). If so, the suit is for "money damages," regardless of whether the plaintiff characterizes the sum of money it seeks as specific rather than substitute relief. *Id.* In short, the Supreme Court decided *Knudson* after *Bowen*; it expressly adopted the *Bowen* dissent's position; and it distinguished *Bowen* in a manner that narrowed *Bowen* considerably.

Accordingly, in *Knudson*'s aftermath, a plaintiff seeking to compel an agency to pay it a sum of money is seeking "money damages," and cannot rely on *Bowen* to overcome sovereign immunity. And were there any lingering doubt after *Knudson* that a suit seeking to compel an agency to pay a plaintiff grant funds is a suit for "money damages," the recent Supreme Court decision in *California* has now settled it conclusively. *California*, 604 U.S. at 650; *see also APHA*, 145 S. Ct. at 2660 ("The Administrative Procedure Act's 'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants," citing *California*). The Supreme Court's "command[]" is clear: when a plaintiff, like Plaintiff here, seeks to compel an agency to pay grant funds, the relief that it seeks constitutes money damages. *APHA*, 145 S. Ct. at 2663 (Gorsuch, J., concurring in part and dissenting in part) ("Lower court judges may sometimes disagree with this Court's decisions, but they are never free to defy them."). Thus, however labeled, the claims "are essentially contractual," *Megapulse*, 672 F.2d at 967, and not subject to district court jurisdiction.

At bottom, however labeled, Plaintiff's claims "are essentially contractual," *Megapulse*, 672 F.2d at 967, and not subject to district court jurisdiction.

## II. This Court Cannot Enforce a Contractual Obligation of Money.

Even if the Court determines that it has jurisdiction, a preliminary injunction is not appropriate for the relief Plaintiff seeks because the Court cannot re-obligate funds that were rescinded by an act of Congress and returned to the U.S. Department of Treasury.

"Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies." *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983) (per curiam). Under Article I of the U.S. Constitution, "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., Art. I, § 9, cl. 7. Hence, "[f]unds appropriated for an agency's use can become unavailable in three circumstances: if the appropriation lapses; if the funds have already been awarded to other recipients; or if Congress rescinds the appropriation.." *City of Houston, Tex. v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426 (D.C. Cir. 1994).

While "a court may act to prevent the expiration of budget authority which has not terminated at the time a suit is filed," *Nat'l Assoc. of Regional Councils v. Costle*, 564 F.2d 583, 588-89 (D.C. Cir. 1977), the Court's authority is a little different when a lawsuit commences after an appropriation has been rescinded. When "there is no underlying congressional authorization for the court to preserve . . . any order of the court to obligate public money conflicts with the constitutional provision vesting sole power to make such authorizations in the Congress." *Costle*, 564 F.2d at 589. In other words, once funds have been rescinded and returned to the Treasury, the district court lacks authority to "order, in essence, appropriated funds from the Treasury for possible obligation." *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 184 (D.C. Cir. 1992). As the Supreme Court has specifically held, "[a]ny exercise of a power granted by the Constitution

to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 425 (1990).

Here, Congress enacted a law specifically rescinding all unobligated balances of amounts appropriated by Public Law 117-169, Section 23003(a)(2). OBBBA, Sec. 10201(3). Following the termination of the subject grant, the funds were de-obligated and, pursuant to the rescission, reverted back to the Treasury. The Court, by act of Congress, has therefore been divested of the authority to provide the relief Plaintiff seeks. Even if the Court were to order reinstatement of the subject grant, USDA lacks funds with which to effectuate such reinstatement. The only adequate remedy, money damages, therefore lies elsewhere.

Therefore, the Court should not grant a preliminary injunction in this case because the Court cannot re-obligate USDA funds that were returned to the Treasury.

## III. Plaintiff is Unlikely to Succeed on the Merits.

Even if the Court finds that it has jurisdiction over Plaintiff's case, which Defendants do not concede, Plaintiff's APA, constitutional, and statutory claims are unlikely to succeed on the merits, for the following reasons. Defendants note that nowhere in Plaintiff's Complaint does Plaintiff challenge the lawfulness of the operative Executive Orders 14154 and 14173, but merely references Executive Orders 14151, 14173, 14154. *See* Compl. ¶¶ 55-59; and Pl. Mem. at 16-17

### A. Plaintiff's APA Claims Fails.

In Counts I-III of the Complaint, Plaintiff asserts that USDA's termination of the subject grant violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). Compl. ¶¶ 94-126; Pl. Mem. at 29.

#### 1. Defendants Complied with 2 CFR § 200.340 in its Decision to Terminate.

Plaintiff summarily lists five reasons why it believes that the grant termination was not in accordance with 2 CFR § 200.340. Compl. ¶¶ 102(a)-(e); Pl. Mem. at 32-34. Plaintiff argues that

the termination relies on a provision, 2 CFR § 200.340(a)(4), that does not apply to USDA awards issued before October 1, 2024, and the subject grant was issued December 18, 2023; that USDA did not "clearly and unambiguously list the grounds for termination in the conditions of the Award"; that termination was based on "new USDA priorities regarding DEI"; that USDA did not "identify or rely on any specific evidence" that Arbor Day's grant "no longer effectuate[d] the priorities it was initially intended to serve"; and that USDA failed to inform Arbor Day of any noncompliance with the grant's requirements. Compl. ¶¶ 102(a)-(e).

Plaintiff's claims, here, will fail because Defendants complied with Executive Orders 14151 and 14173, 2 CFR § 200.340(a)(4), and the terms and conditions of the award, when deciding and notifying Arbor Day of the grant termination. *See* Pl. Mem., Ex. A, ECF No. 8-2 at 15. In its termination letter, USFS clearly stated the grounds for the termination under 2 CFR § 200.340(a)(4), to include the determination that the grant "no longer effectuates agency priorities regarding diversity, equity, and inclusion programs and activities." *Id.* USFS even went so far as to correspond with Arbor Day from March 2025 through January 2026, regarding the basis of the termination and addressing Arbor Day's concerns. *See* Pl. Mem., Ex. C, D, E, F, G, ECF No. 8-2. Thus, Plaintiff's claim here under the APA will not succeed on the merits.

2. <u>Defendants Decision Was Not Arbitrary and Capricious.</u>

Plaintiff attempts to argue that Defendants' grant termination was arbitrary and capricious based on a handful of undeveloped reasons. Compl. ¶ 111(a)-(h); Pl. Mem. at 34-37. Further, Plaintiff argues that the termination was not in accordance with the statutory provisions in the CFAA and IRA and thus violates the APA. Compl. ¶¶ 115-126; Pl. Mem. at 37-39.

In response, Defendants maintain that the Court does not have jurisdiction to hear these arguments, and even if it did, which Defendants do not concede, these are undeveloped arguments that the Court need not address. *Robinson v. Farley*, 364 F. Supp. 3d 154, 162 (D.D.C. 2017). "It

is plaintiff's task to spell out his arguments squarely and distinctly." *Raines v. Dep't of Just.*, 424 F. Supp. 2d 60, 66 n.3 (D.D.C. 2006) (cleaned up). "[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived." *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013).

In short, Plaintiff has failed to establish any viable claim under the APA. Because Plaintiffs have failed to demonstrate any applicable waiver of sovereign immunity, the Court lacks subject-matter jurisdiction and the Complaint must be dismissed. *Arbaugh*, 546 U.S. at 514.

**B. Plaintiff's Constitutional Claims Fails.**

Plaintiff also raises constitutional violations, such as separation of powers (Count IV); an *ultra vires* claim (Count V); violation of procedural due process under the Fifth Amendment (Count VI); and a void for vagueness claim (Count VII). *See* Compl. ¶¶ 127-161; Pl. Mem. at 39-43.

1. <u>Plaintiff's Claims are Subject to the Adequate Remedy and Implied Preclusion Bars of the APA and Tucker Act.</u>

A plaintiff asserting constitutional claims will generally explicitly rely on the APA's sovereign immunity waiver. "Where a plaintiff has brought suit against the federal government (or a government official sued in their official capacity), a federal court is without jurisdiction to consider the complaint in the absence of an express waiver of sovereign immunity." *Z St., Inc. v. Koskinen,* 44 F. Supp. 3d 48, 63 (D.D.C. 2014), *aff'd sub nom. Z St. v. Koskinen*, 791 F.3d 24 (D.C. Cir. 2015) (citing *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) (noting that "[s]overeign immunity is jurisdictional in nature")). The waiver is subject to the adequate remedy and implied preclusion bars—dooming Plaintiff here. *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations.").

Courts routinely consider whether constitutional claims brought in cases implicating the Tucker Act are forbidden under the adequate remedy or implied preclusion bars. *Consol. Edison Co. of New York v. U.S., Dep't of Energy*, 247 F.3d 1378, 1385-86 (Fed. Cir. 2001) (directing district court to transfer case sounding in contract but asserting constitutional claims to the Court of Federal Claims because the Court "can supply an 'adequate remedy' to prevent the constitutional wrongs alleged by [plaintiff]").

Here, Plaintiff's constitutional claims effectively seek a contractual remedy, these jurisdictional limits apply and are, therefore, barred.

2. <u>Plaintiff's Separation of Powers and *Ultra Vires* Claims are Statutorily Barred.</u>

Plaintiff's claim that Defendants' decision to terminate the grant "violates the Constitution's mandate on separation of powers, and is *ultra vires*" is barred because they are purely statutory in nature. Compl. ¶¶ 127-134; Pl. Mem. at 39-41.

The Supreme Court has made clear that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review[.]" *Dalton v. Specter*, 511 U.S. 462, 473 (1994). This keeps with the long tradition of "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id*. at 472. The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the executive officers rely on an unconstitutional statute. *Id*. at 473, n.5. Neither of those situations applies here. "Plaintiffs, accordingly, may not circumvent the Tucker Act or the APA's reviewability bar by reframing an alleged statutory violation as a constitutional claim." *Amica Ctr. for Immigrant Rts. v. U.S. Dep't of Just.*, No. CV 25-298 (RDM), 2025 WL 1852762, at *17 (D.D.C. July 6, 2025); *see also Ctr. for Biological*

*Diversity v. Trump*, 453 F. Supp. 3d 11, 51–54 (D.D.C. 2020) (dismissing constitutional claims challenging border wall construction based on *Dalton*).

In addition, Plaintiff's procedural due process claim fails because Arbor Day has no protected interest in the grant it had received. Plaintiff argues that its due process rights were denied because it states that it had a "constitutionally protected interest" and did not receive sufficient notice or opportunity to challenge the termination, prior to termination. Compl. ¶¶ 141, 144-145. This, without more, is unavailing.

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in liberty or property." *Nat'l Urban League v. Trump*, --- F. Supp. 3d ---, Civ. A. No. 25-0471 (TJK), 2025 WL 1275613, at *17 (D.D.C. May 2, 2025) (citation modified). "The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire'" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005) (citation modified). There is only a narrow set of government benefits, so-called "new property," that receive Due Process protection. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573-74 (1972) (collecting cases). Examples include tenured teaching positions and welfare benefits. See *Perry v. Sindermann*, 408 U.S. 593, 596 (1972); *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970).

The grant at issue here is nothing like "welfare benefits under statutory and administrative standards" or "public employment" subject to "tenure provisions." *Roth*, 408 U.S. at 576–77. Therefore, Plaintiff cannot show a constitutionally protected property interest in the grant, and its claim fails.

Further, Plaintiff's *ultra vires* claim fails for the same reasons its APA claims and procedural due process claim fails. "[S]uits for specific relief against officers of the sovereign" allegedly acting "beyond statutory authority or unconstitutionally" are not barred by sovereign immunity. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689, 693 (1949). The exception to sovereign immunity is based on the principle that such *ultra vires* action by a federal officer "is beyond the officer's powers and is, therefore, not the conduct of the sovereign." *Id.* at 690. Here, Plaintiff does not advance any *ultra vires* claim distinct from their APA claims, and therefore, the *ultra vires* claim fails. Compl. ¶¶ 135-138; Pl. Mem. at 39-41.

3. Plaintiff's Separation of Powers and *Ultra Vires* Claim is Statutorily Barred.

Plaintiff improperly invokes the vagueness standard that pertains to government enforcement actions. Compl. ¶¶ 150-159; Pl. Mem. at 42-43. Plaintiff argues that Defendants' termination letter states that the grant "no longer effectuates agency priorities regarding diversity, equity, and inclusion programs and activities," and that the terms "effectuate," "priorities," and the characterization of Arbor Day's treeplanting programs as "diversity, equity, and inclusion programs and activities" are not defined in the letter, grant award, law, or regulations, and are unconstitutionally vague. Compl. ¶¶ 157-159; Pl. Mem. at 43.

But the void-for-vagueness doctrine under the Fifth Amendment is inapplicable here. This doctrine "guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes." *Sessions v. Dimaya*, 584 U.S. 148, 155-56 (2018) (plurality). While courts have applied this doctrine outside of the statutory context, they have done so in limited circumstances, usually with respect to regulations of primary conduct subject to "civil penalties." *Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (citation modified). Here, the Court should reject Plaintiff's insistence on imposing a vagueness standard on the government even when it "is acting as patron rather than

as sovereign." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998). "To accept [Plaintiffs'] vagueness argument would be to call into question the constitutionality of . . . valuable Government programs and countless others like them" that "award[] scholarships and grants on the basis of subjective criteria such as 'excellence.'" *Id.*

Moreover, Plaintiff's motion fails to cite to any authority that suggests such standards for specificity apply to a termination notice. The two cases that Plaintiff relies on for its argument are unsupportive. For example, *Grayned v. City of Rockford,* 408 U.S. 104 (1972), concerns notice of a city anti-noise ordinance. The other case, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012), addresses whether notice was given to a TV station about a "fleeting expletive or a brief shot of nudity could be actionably indecent." *FCC*, 567 U.S. at 254. Notwithstanding the unrelated case citations, Plaintiff's void for vagueness claim fails.

Therefore, Plaintiff cannot establish a likelihood of success for its APA claims and constitutional claims, which include separation of powers (Count IV); an *ultra vires* claim (Count V); violation of procedural due process under the Fifth Amendment (Count VI); and a void for vagueness claim (Count VII).

## IV. <u>Plaintiff Has Not Failed to Demonstrate Irreparable Harm.</u>

For what is perhaps the most critical argument for the success of Plaintiff's preliminary injunction motion – irreparable harm – Plaintiff fails to make its case.

As described recently in the district, "[t]he irreparable harm prong of the preliminary injunction analysis is no walk in the park." *Dallas County, Texas, v. Kennedy*, No. 25-CV-4242 (CRC), 2026 WL 2123225, at *4 (D.D.C. July 23, 2026). The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches*, 454 F.3d 290, 297 (D.C. Cir. 2006). The moving party must demonstrate an injury that is "'both certain and great'" and "actual and not theoretical." *Id.* (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 298). The harm must

be "imminent and beyond remediation without the Court's intervention." *Dallas County*, 2026 WL 2123225. The injury must "be beyond remediation," meaning that where, as here, the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2024) (citation modified).

"A movant for preliminary relief cannot simply make broad conclusory statements about the existence of harm." *Dallas County*, 2026 WL 2123225, at *4 (cleaned up) (quoting *Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 21 (D.D.C. 2013)). In *Dallas County*, the district court found that the plaintiff had not "established irreparable harm because the evidence of such harm associated with the termination of the . . . grant, in particular, remains vague." *Id.* Although, there, the plaintiff provided a sworn declaration that addressed funding cuts and the loss of staff, this was still insufficient to demonstrate to the court that, for example, "the loss of federal funding has 'threaten[ed] the very existence of the recipient's operations.'" *Id.* at *5.

Here, Plaintiff has entirely failed to meet its burden of showing that it or any of the 47 subrecipients and municipalities have suffered or will suffer severe and irreparable harm. *See* generally, Compl. and Pl. Mem. At most, conclusively states, without more, in its Complaint and motion, that the termination grant has "caused and continues to cause severe and irreparable harm to Arbor Day and to the 47 subrecipients and municipalities across the country that depend on the Grant for urban forestry programs." Compl. ¶ 88; Pl. Mem. at 44. "The termination has halted tree planting and maintenance activities in communities" across at least eight states. Compl. ¶ 89; Pl. Mem. at 44. "Subrecipients have been forced to stop their urban forestry programs, causing disruption to ongoing projects and harm to the communities they serve its irreparable harm as a loss of First Amendment freedoms." Compl. ¶ 90; Pl. Mem. at 44. But that is it.

Viewing Plaintiff's alleged irreparable harm through the lens of *Dallas County*, Plaintiff has failed to meet its burden of showing through a sworn declaration that "the loss of federal funding has 'threaten[ed] the very existence of the recipient's operations,'" (*Dallas County*, 2026 WL 2123225, at *5), which, here, as alleged, is the "hal[ting of] tree planting and maintenance activities." Compl. ¶ 89; Pl. Mem. at 44. Here, Plaintiff provides 10 exhibits, of which only one is a sworn declaration. That declaration is from declarant Logan Donahoo, Senior Manager of Grants and Programs at Arbor Day, who makes the same word-for-word statements in the Complaint and motion that are outlined above in the preceding paragraph. There is no scintilla of evidence in Mr. Donahoo's declaration that supports a showing of irreparable harm. *See* Donahoo Decl., "V. Harm to Arbor Day and its Sub-Recipients," ¶¶ 40-50. One would anticipate that for a request to the Court to gain access of all remaining funds in a $75,000,000 grant, more than conclusory statements would be made about harm in a declaration. *Id.*

There is no showing whatsoever in Mr. Donahoo's declaration that the subrecipients' "urban forestry programs . . . [and] ongoing projects" were "forced to stop" as a result of the termination. Compl. ¶ 90; Pl. Mem. at 44. There is no showing in Mr. Donahoo's declaration as to how the Plaintiff, Arbor Day, "has been forced to divert time and resources away from its mission and other critical projects" because of the grant termination. Compl. ¶ 91; Pl. Mem. at 44. Every allegation in Plaintiff's Complaint about suffering irreparable harm is nothing more than a conclusory statement.

Furthermore, Plaintiff makes no showing of how the purported harm to Arbor Day and the 47 subrecipients and municipalities is at all imminent. It is not. Plaintiff waited over 13 months to file this suit – and meanwhile, any funds that remained in the grant were ultimately rescinded

and returned to the U.S. Department of Treasury. Hence, there is no harm so imminent and beyond remediation that the Court must intervene.

As such, Plaintiff wholly fails to meet its burden under the irreparably harm prong, and the Court should deny Plaintiff's motion for a preliminary injunction. *See Dallas County*, 2026 WL 2123225, at *5-6.

**V. <u>The Balance of the Equities and the Public Interest Weigh Against Granting Preliminary Relief.</u>**

Lastly, Plaintiff conclusively argues that the "harm inflicted on Arbor Day and the communities it serves . . . far outweighs Defendants' interest in immediately enforcing the Grant termination." Pl. Mem. at 46-47. Plaintiff goes on to state that the preservation of its rights under the APA and Constitution are essential to the public interest, while advancing Congress's purposes under the grant. Pl. Mem. at 46-47. Yet, Plaintiff wholly fails to identify who is in the public, except for "47 subrecipients and municipalities" and Arbor Day itself. It also fails to acknowledge any of the federal government's interests at issue in this analysis.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. These factors tilt decisively against granting a preliminary injunction here. *See Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023).

As succinctly stated in *Dallas County*, and reiterated here, "[t]he balance of equities here also does not militate in favor of granting an injunction under present circumstances." *See Dallas County*, 2026 WL 2123225, at *6. Although some harms have been identified by Plaintiff in its Complaint and motion, and Defendants do not concede that Plaintiff has met its burden of proof for irreparable harm, "those harms are not so irremediable as to outweigh the potential risk of

erroneously ordering the government to pay grant funds at a time when the D.C. Circuit is poised to opine on key jurisdictional and merits questions that likely bear directly on the case." *Id.*

Defendants state that granting a preliminary injunction would disrupt the Department's review of existing grants. The public has an interest in permitting the Department to take decisive action when it comes to setting its policy priorities. Entering any sort of preliminary relief would displace and frustrate the Executive's decision about how to best address those issues. *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985).

Moreover, given that the funds from the subject grant were rescinded and returned to the Treasury, there is no further relief that the Court can grant. Any preliminary injunction granted in this case would be futile.

Therefore, as discussed above, Plaintiff will not suffer irreparable harm from the denial of its request for preliminary relief because Plaintiff has not shown that its harm could not otherwise be remediated later.

## VI. Any Preliminary Injunction Should Be Stayed.

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or, at a minimum, administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the Court of Appeals if an appeal is authorized.

## VII. The Court Should Order that Plaintiff Post a Bond as a Condition of Preliminary Relief.

Defendants also respectfully request that any injunctive relief be accompanied by a bond. "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The

D.C. Circuit recently clarified that "injunction bonds are generally required." *NTEU v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025), *reh'g en banc denied* (July 16, 2025). A bond is appropriate here given that the requested preliminary relief would potentially require the Executive to spend money and resources that may not be recouped once distributed and employed.

* * *

**CONCLUSION**

For these reasons, Defendants respectfully request that the Court deny Plaintiff's motion a preliminary injunction (ECF No. 8).

Dated: August 6, 2026
Washington, DC

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: */s/ Catherine J. Malycke*
CATHERINE J. MALYCKE
VA Bar No. 84952
DIMITAR GEORGIEV-REMMEL
Bar #1735756
Assistant United States Attorneys
Civil Division
601 D Street, NW
Washington, D.C. 20530
Tel: (202) 809-3495

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NATIONAL ARBOR DAY FOUNDATION,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*,<br><br>Defendants. | Civ. A. No. 26-1732 (CRC) |

**[PROPOSED] ORDER**

UPON CONSIDERATION of Plaintiff's motion for a preliminary injunction, Defendants' opposition, and the entire record herein, it is hereby

ORDERED that Plaintiff's motion is DENIED.

SO ORDERED:

__________________
Date

____________________________________
CHRISTOPHER R. COOPER
United States District Judge