IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NATIONAL ARBOR DAY FOUNDATION,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*,<br><br>*Defendants*. | Case No. 1:26-cv-01732<br><br>Judge Christopher R. Cooper |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS**
**MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**


I. INTRODUCTION ........................................ 1

II. ARGUMENT ........................................ 2

A. This Court Has Jurisdiction Over Arbor Day's Claims. ........................................ 2

B. *Bowen v. Massachusetts* Remains Controlling, and Defendants' Reliance on *Dep't of Educ. v. California* and *NIH v. American Public Health Association* Is Misplaced. .................. 6

C. The OBBBA Rescission Neither Moots Arbor Day's Case nor Deprives the Court of Jurisdiction. ........................................ 7

D. Arbor Day Is Likely to Succeed on the Merits. ........................................ 9

E. Arbor Day Will Suffer Irreparable Harm Without Relief. ........................................ 17

F. The Balance of Equities and Public Interest Weigh in Favor of Relief. ........................... 21

G. Any Resulting Preliminary Injunction Should Not Be Stayed. ........................................ 23

H. The Court Should Not Require Arbor Day to Post Bond. ........................................ 24

III. CONCLUSION ........................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aiken County*,
725 F.3d 255 (D.C. Cir. 2013) .......... 9, 10, 16

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) .......... 13

*Amoco Production Co. v. Village of Gambell*,
480 U.S. 531 (1987) .......... 19

*Bldg. Trades Unions v. Dep't of Def.*,
No. 25-cv-1070 (RC), 2025 WL 1423610 (D.D.C. May 16, 2025) .......... 24

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) .......... 1, 5

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .......... 17

*Chicago Women in Trades*, No. 25-cv-1497, slip op. at 12 (N.D. Ill. Mar. 27, 2025) .......... 4

*City of Houston v. Dep't of Hous. & Urban Dev.*,
24 F.3d 1421 (D.C. Cir. 1994) .......... 8

*Climate United Fund v. Citibank, N.A.*,
778 F. Supp. 3d 90 (D.D.C. 2025) .......... 4

*Cnty. of Santa Clara v. Trump*,
275 F. Supp. 3d 1196 (N.D. Cal. 2017) .......... 16

*Dallas County v. Kennedy*,
2026 WL 2123225 (D.D.C. July 23, 2026) .......... 17, 18

*Dalton v. Specter*,
511 U.S. 462 (1994) .......... 15

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019) .......... 12

*Dep't of Educ. v. California*,
604 U.S. 650 (2025) .......... 7

*Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*,
804 F. Supp. 3d 524 (D. Md. 2025) ........ 7, 25

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*,
502 F. Supp. 3d 492, 520 (D.D.C. 2020) ........ 24

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 ........ 12

*Great-West Life & Annuity Insurance Co. v. Knudson*,
534 U.S. 204 (2002) ........ 6

*Heckler v. Chaney*,
470 U.S. 821 (1985) ........ 22

*Ingersoll-Rand Co. v. United States*,
780 F.2d 74 (D.C. Cir. 1985) ........ 4

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ........ 21

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) ........ 3, 5

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
463 U.S. 29 (1983) ........ 11

*Nat. Res. Def. Council, Inc. v. Morton*,
337 F. Supp. 167 (D.D.C. 1971) ........ 24

*National Council of Nonprofits v. Office of Management & Budget*,
775 F. Supp. 3d 100 (D.D.C. 2025) ........ 24

*NIH v. Am. Pub. Health Ass'n ("APHA")*,
145 S. Ct. 2658 (2025) ........ 7

*Nken v. Holder*,
556 U.S. 418 (2009) ........ 21, 23

*OPM v. Richmond*,
496 U.S. 414 (1990) ........ 9

*Rochester Pure Waters Dist. v. EPA*,
960 F.2d 180 (D.C. Cir. 1992) ........ 8

*S. Educ. Found. v. United States Dep't of Educ.*,
784 F. Supp. 3d 50 (D.D.C. 2025) ........ 7

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) .......... 14

*Sierra Club v. U.S. Army Corps of Eng'rs*,
645 F.3d 978 (8th Cir. 2011) .......... 20

*Spectrum Leasing Corp. v. United States*,
764 F.2d 891 (D.C. Cir. 1985) .......... 4

*Train v. City of New York*,
420 U.S. 35 (1975) .......... 9, 10

*Urban Sustainability Directors Network v. USDA*,
2025 WL 2374528 (D.D.C. Aug. 14, 2025) .......... *passim*

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
778 F. Supp. 3d 440 (D.R.I. 2025) .......... 2, 4, 9

*Zinermon v. Burch*,
494 U.S. 113 (1990) .......... 16

**Statutes**

2 U.S.C. §§ 681-688 .......... 10

5 U.S.C. § 702 .......... 6

5 U.S.C. § 706(2) .......... 5

5 U.S.C. § 706(2)(A) .......... 3

16 U.S.C. § 2105(a) .......... 22

16 U.S.C. § 2105(b)(5), (c) .......... 10

29 U.S.C. § 1132(a)(3) .......... 6

Cooperative Forestry Assistance Act, 16 U.S.C. § 2105 .......... 10, 25

Pub. L. No. 117-169, § 23003(a)(2) .......... 10, 25

Pub. L. No. 119-21, § 10201(3) .......... 8

Tucker Act, 28 U.S.C. § 1491 .......... 2

**Other Authorities**

2 C.F.R. § 200.340(a)(4) .......... 10, 13, 14

2 C.F.R. § 200.340(b) (2024) .......... 13

2 CFR 200.340(a)(4) .......... 13

Federal Rule of Civil Procedure 65(c) .......... 23, 24

## I. INTRODUCTION

Defendants' response brief confirms what the record already makes clear: the government has no substantive defense of its improper termination of the National Arbor Day Foundation's ("Arbor Day") $75 million Urban and Community Trees cooperative agreement (the "Grant"). Rather than engage on the substance of the termination, Defendants unsuccessfully attempt to erect jurisdictional barricades, invoke a congressional appropriation rescission that postdates the Grant termination by nearly five months, and mischaracterize the nature of Arbor Day's claims. None of these arguments withstand scrutiny.

On jurisdiction, this Court itself exercised jurisdiction over materially identical claims in *Urban Sustainability Directors Network v. USDA*, 2025 WL 2374528 (D.D.C. Aug. 14, 2025) ("*USDN*"), which involved the same program, the same agency, and the same form termination letter. Similarly here, Arbor Day does not seek money damages or specific performance, it seeks what the Administrative Procedures Act ("APA") expressly authorizes: vacatur of unlawful agency action and prospective declaratory and injunctive relief, grounded in the Constitution, the Cooperative Forestry Assistance Act, the Inflation Reduction Act ("IRA"), the Uniform Guidance, and the *ultra vires* doctrine. This is precisely the distinction this Court drew in *USDN* and that *Bowen v. Massachusetts*, 487 U.S. 879 (1988), has drawn for nearly four decades.

On the merits, the termination letter sent to Arbor Day is virtually indistinguishable from the one this Court found unlawful in *USDN*. It contains no individualized analysis and bears no rational connection to the Grant's actual activities – tree planting, urban reforestation, hazard-tree abatement, and canopy management. The government's attempt to characterize the Grant as a "DEI program" is flatly incorrect: the equity-related language Defendants cite was incorporated solely because the government's own Notice of Funding Opportunity ("NOFO") required

applicants to use such language to qualify for the match waiver that the government itself offered. The government is weaponizing language it mandated against the very applicant that complied with its instructions.

The One Big Beautiful Bill Act ("OBBBA") rescission argument is equally unavailing. The termination occurred on February 14, 2025, approximately five months before OBBBA was enacted on July 4, 2025, and rescinded only "unobligated balances." Courts have uniformly rejected this theory, ordering reinstatement of terminated grants notwithstanding subsequent de-obligation. *See USDN*, 2025 WL 2374528, at *38; *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 469 (D.R.I. 2025). The government cannot manufacture mootness by unlawfully terminating a grant, de-obligating the funds, and then invoking the absence of funds as a shield against judicial review.

Finally, the government's irreparable harm arguments dismiss detailed evidence in the record, including the cancellation of 79 subaward agreements across 33 states, the loss of irreplaceable tree-planting seasons, organizational and reputational injury, and environmental harm that is, by its very nature, irreparable.

For the reasons set forth herein and in Arbor Day's opening memorandum, Arbor Day respectfully requests that the Court grant its motion for preliminary injunction.

## II. ARGUMENT

### A. <u>This Court Has Jurisdiction Over Arbor Day's Claims.</u>

The government's jurisdictional argument rests on a fundamental mischaracterization of this lawsuit. Defendants contend that the Tucker Act, 28 U.S.C. § 1491, divests this Court of subject matter jurisdiction because Arbor Day's claims are "essentially contractual" and the relief sought amounts to a "request for federal dollars." Defs.' Opp'n at 10, ECF No. 31. That argument

ignores the nature of the claims that Arbor Day has asserted, the relief sought, and the instrument at issue, which is a cooperative agreement, not a contract. It also ignores this Court's holding in *USDN*, which confronted this identical argument in the context of grants issued under the same statutory program by the same agency. In that case, the Court held that "plaintiffs are not seeking relief arising directly from the grants themselves and are requesting relief that is decidedly not contractual in nature. Plaintiffs' claims are properly before this Court." 2025 WL 2374528 at *13. This Court should reach the same conclusion here.

1. <u>Arbor Day's Claims Arise from Statutes, Regulations, and the Constitution, Not the Grant.</u>

Under the D.C. Circuit's two-prong framework, whether the Tucker Act divests this Court of jurisdiction depends on (1) "the source of the right upon which the plaintiff bases its claims" and (2) "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967-71 (D.C. Cir. 1982)). As to the first prong, Arbor Day's claims do not arise from the Grant itself. Arbor Day asserts seven causes of action grounded in the APA, 5 U.S.C. § 706(2)(A); the Cooperative Forestry Assistance Act, 16 U.S.C. § 2105; the IRA, Pub. L. No. 117-169, § 23003(a)(2); the Uniform Guidance at 2 C.F.R. Part 200; the Due Process Clause of the Fifth Amendment; the separation of powers under Article I; and the *ultra vires* doctrine. *See* Compl. at ¶¶ 94-159, ECF No. 1. Arbor Day contends that Defendants violated these statutory mandates, acted arbitrarily and capriciously, and deprived Arbor Day of constitutionally protected interests.

These are claims that "exist independently of" any contractual relationship. *Megapulse*, 672 F.2d at 968. Indeed, Arbor Day would have standing to challenge the USDA's termination decision under the APA even if no cooperative agreement existed because the APA authorizes judicial review of any "final agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This Court decided as much in

*USDN*: "The rights [plaintiffs] assert are not protected by the agreements at all, but rather by statutes, regulations, the Constitution, and the APA." 2025 WL 2374528, at *15. That holding applies with equal force here, because Arbor Day asserts the same categories of rights under the same legal authorities. Defendants offer no basis to distinguish the Court's holdings in *USDN*. Other courts have reached the same conclusion. *See Woonasquatucket*, 778 F. Supp. 3d at 456 (plaintiffs' "APA, statutory, and constitutional claims" were "not essentially contractual" because they "would exist regardless of whether plaintiffs had entered into cooperative agreements"); *Chicago Women in Trades*, No. 25-cv-1497, slip op. at 12 (N.D. Ill. Mar. 27, 2025) ("constitutional claims challenging the government's DEI-related executive actions" are "not contract claims merely because the plaintiffs happen to have grant agreements"); *Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 102-03 (D.D.C. 2025) (exercising jurisdiction over claims challenging grant terminations under the APA).

Defendants cite *Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir. 1985), and *Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985), for the proposition that Arbor Day's claims are "essentially contractual." Defs.' Opp'n at 12-13, ECF No. 31. Those cases involved plaintiffs who challenged the government's breach of specific contractual obligations, meaning that the "essence" of those claims was that the government failed to perform contractual duties. Here, Arbor Day does not allege breach of a contractual obligation. Arbor Day contends that the government acted unlawfully in violation of the APA, federal statutes, federal regulations, and the Constitution when it terminated the Grant for pretextual reasons bearing no connection to the Grant's actual activities. That is a fundamentally different claim.

The fact that success on the merits ultimately may result in the government's resumption of performance under the Grant does not transform the relief into money damages. As the Supreme

Court held in *Bowen*, "the fact that a judicial decree may eventually require the payment of money by the Government does not mean that the suit is for money damages." 487 U.S. at 893. The D.C. Circuit has "cautioned that this inquiry cannot lead to the perverse outcome that neither the district court nor the Court of Federal Claims has jurisdiction." *USDN*, 2025 WL 2374528, at *13. That is precisely the result the government's position would produce here.

2. <u>The Relief Sought by Arbor Day Is Equitable Vacatur, Not Money Damages.</u>

The second *Megapulse* prong asks whether "the type of relief sought" is contractual. 672 F.2d at 968. Arbor Day seeks vacatur of unlawful agency action under 5 U.S.C. § 706(2), the paradigmatic APA remedy. *See* Pl.'s Mem. Supp. Mot. Prelim. Inj. at 49, ECF No. 8-1 (hereinafter "Pl.'s Mem."). Vacatur constitutes equitable relief, not money damages. It does not matter that the practical effect of vacatur may result in the resumption of grant funding, because as mentioned previously, the Supreme Court has held that "[r]elief that orders a correction in the manner in which the agency applies its payment formula is not equivalent to damages" even if it "incidentally" results in the payment of money. *Bowen*, 487 U.S. at 879.

Defendants characterize Arbor Day's prayer for relief as a request for "access to all of the remaining funds in the $75,000,000 USDA grant." Defs.' Opp'n at 10-11, ECF No. 31. That characterization is misleading. Arbor Day asks this Court to set aside an unlawful agency decision and reinstate the Grant. The remedy for an unlawful agency action is vacatur and reinstatement of the status quo ante. That the status quo ante includes an ongoing grant obligation does not transform equitable relief into money damages. As the Court explained in *USDN*: "The relief plaintiffs seek – vacatur of an unlawful termination decision and reinstatement of the grant – is specific relief available under the APA, not money damages. The fact that such relief will require

the government to continue making payments under the grant does not transform it into a claim for money damages." 2025 WL 2374528, at *13. The same analysis applies here.

Even if there was doubt as to whether Arbor Day's claims sound in contract, the Tucker Act cannot divest this Court of jurisdiction where the Court of Federal Claims lacks power to grant the relief sought. The Court of Federal Claims "does not have the general equitable powers of a district court to grant prospective relief." *USDN*, 2025 WL 2374528, at *12. It cannot vacate agency action under the APA, issue declaratory judgments regarding the constitutionality of government conduct, enjoin federal agencies from maintaining unlawful terminations, or provide the prospective, forward-looking relief that Arbor Day seeks. This Court is the only forum in which Arbor Day can obtain the relief it seeks.

### B. ***Bowen v. Massachusetts* Remains Controlling, and Defendants' Reliance on *Dep't of Educ. v. California* and *NIH v. American Public Health Association* Is Misplaced.**

Defendants argue that *Bowen* "is no longer controlling" in light of *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002). Defs.' Opp'n at 14-16, ECF No. 31. This is incorrect. *Knudson* was an ERISA case interpreting the scope of "equitable relief" under 29 U.S.C. § 1132(a)(3). It did not involve the APA, the Tucker Act, or sovereign immunity. The Supreme Court's analysis of what constitutes "equitable relief" under ERISA's specific statutory text says nothing about the scope of the APA's waiver of sovereign immunity under 5 U.S.C. § 702. *Knudson* did not overrule *Bowen* and has not been read as having done so. The majority in *Knudson* explicitly distinguished *Bowen*, stating: "*Bowen* involved the distinct question of whether a suit seeking enforcement of a statutory obligation to pay money constituted a 'suit for money damages' barred by sovereign immunity, not whether such relief is 'equitable.'" 534 U.S. at 218 n.4. Far from overruling *Bowen*, *Knudson* expressly preserved it.

Defendants' reliance on *Dep't of Educ. v. California*, 604 U.S. 650 (2025), and *NIH v. Am. Pub. Health Ass'n ("APHA")*, 145 S. Ct. 2658 (2025), fares no better. *California* was a stay order, not a merits decision, and the Court expressly noted that "[w]hether the district court has jurisdiction over respondent's claims involves contested and difficult questions." 604 U.S. at 652. The Court did not hold that the Tucker Act bars district court jurisdiction over APA challenges to grant terminations. Indeed, Justice Barrett's concurrence emphasized that the scope of the APA waiver of sovereign immunity "is an important question, but not one the Court resolves today." *Id.* at 654 (Barrett, J., concurring). As for *APHA*, that case involved NIH research grants where the plaintiffs sought to "enforce [an] obligation to pay money pursuant to [the] grants." 145 S. Ct. at 2658. The Supreme Court's per curiam opinion did not analyze the *Megapulse* factors or address cases where, as here, the plaintiff challenges agency action as unlawful under independent statutory and constitutional authorities. District courts have distinguished *APHA* on this basis. *See S. Educ. Found. v. United States Dep't of Educ.*, 784 F. Supp. 3d 50, 62 (D.D.C. 2025) (holding that *APHA* "does not control" where plaintiffs challenge "the lawfulness of the agency's termination decision" rather than seeking to "enforce contractual payment obligations"); *Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*, 804 F. Supp. 3d 524, 534 (D. Md. 2025) (same).

### C. The OBBBA Rescission Neither Moots Arbor Day's Case nor Deprives the Court of Jurisdiction.

Defendants argue that because Congress rescinded unobligated IRA § 23003(a)(2) balances through the OBBBA, and because USFS subsequently de-obligated the remaining Grant funds, the Court cannot grant Arbor Day relief. Defs.' Opp'n at 17, ECF No. 31. This argument fails for multiple reasons.

***First***, the sequence of events is dispositive. The Grant funds were obligated upon award to Arbor Day on December 18, 2023. The Grant termination occurred on February 14, 2025. The

OBBBA was enacted on July 4, 2025, nearly five months *after* the termination, and rescinded only "*unobligated* balances." Pub. L. No. 119-21, § 10201(3) (emphasis added). The operative term is "unobligated balances," meaning funds that had been obligated through valid awards were not subject to rescission. USFS de-obligated the remaining funds on July 11, 2025. If the termination was unlawful (it was), then the funds were never lawfully de-obligated and were not "unobligated balances" subject to rescission at the time of the OBBBA's enactment.

Contending otherwise, the government cites *City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421 (D.C. Cir. 1994), and *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180 (D.C. Cir. 1992), for the proposition that courts cannot order the obligation of rescinded funds. *See* Defs.' Opp'n at 17, ECF No. 31. But those cases involved situations where appropriations had independently lapsed or been rescinded, not situations where the government's own predicate unlawful act created the condition it now invokes as a defense. Here, the funds became "unobligated" only because of the unlawful termination. This causal chain distinguishes this case from *City of Houston* and *Rochester Pure Waters*.

***Second***, the government cannot manufacture mootness through its own unlawful conduct. The government's position, taken to its logical conclusion, would allow any agency to insulate any unlawful grant termination from judicial review by moving quickly to de-obligate the funds before a court can act. That cannot be the law. Here, the de-obligation occurred *because* of the unlawful termination. If the termination is vacated, the de-obligation that flowed from it is likewise void.

***Third***, courts have ordered reinstatement of terminated grants and restoration of funding notwithstanding subsequent de-obligation. In *USDN*, this Court ordered the USDA to "reinstate the cooperative agreements" and "restore all previously obligated funding," rejecting the government's argument that de-obligated funds were unavailable. 2025 WL 2374528, at *38. In

*Woonasquatucket*, the court entered a nationwide injunction requiring the USDA to restore terminated grants, finding that the government's subsequent de-obligation actions "cannot shield the agency from review of its underlying unlawful termination decisions." 778 F. Supp. 3d at 469.

***Fourth***, the Appropriations Clause does not bar relief. Defendants cite *OPM v. Richmond*, 496 U.S. 414 (1990), and related cases, but those cases stand for the irrelevant proposition that courts cannot order expenditures absent congressional authorization. Here, congressional authorization exists: Congress appropriated $1.5 billion for the Urban and Community Forestry Assistance program through the IRA. The question here is whether an executive agency can frustrate an appropriation by unlawfully terminating grants and then pointing to the absence of funds it unlawfully de-obligated to avoid review. The answer must be no. *See Train v. City of New York*, 420 U.S. 35, 44 (1975) (the President "cannot frustrate the will of Congress" by refusing to disburse appropriated funds). As the D.C. Circuit has recognized, the Appropriations Clause is not a license for the Executive to override statutory mandates or frustrate judicial review of unlawful action. *See In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) (agencies cannot "decline to follow a statutory mandate or prohibition simply because of policy objections").

In sum, if the termination is vacated, the de-obligation was necessarily without legal basis, and the Grant funds' obligated status would be restored. OBBBA's rescission of "unobligated balances" is therefore inapplicable here and does not deprive this Court of jurisdiction.

### D. Arbor Day Is Likely to Succeed on the Merits.

The government's merits arguments amount to the assertions that the government complied with the termination regulation and that Arbor Day's arguments are "undeveloped" and "perfunctory." Defs.' Opp'n at 19-20, ECF No. 31. Neither assertion withstands scrutiny. The

termination was contrary to statute and arbitrary and capricious, and the government's purported compliance with 2 C.F.R. § 200.340(a)(4) fails on multiple grounds.

1. The Termination Was Contrary to the CFAA and IRA.

Congress enacted the Cooperative Forestry Assistance Act of 1978 ("CFAA"), 16 U.S.C. § 2105, directing the Secretary of Agriculture to "provide financial, technical, and related assistance to State foresters or equivalent State officials" to implement programs for "tree planting" and to "reduce carbon dioxide emissions, conserve energy, and improve air quality." 16 U.S.C. § 2105(b)(5), (c). Congress reinforced this mandate through the IRA, which appropriated $1.5 billion specifically for grants through the Urban and Community Forestry Assistance program "for tree planting and related activities." Pub. L. No. 117-169, § 23003(a)(2).

Arbor Day's Grant advances precisely these statutory objectives: tree planting, urban reforestation, hazard-tree abatement, canopy management, and dead-tree removal. Compl. at ¶¶ 37-39, ECF No. 1; Donahoo Decl. at ¶¶ 16-17, ECF No. 8-2. The USDA cannot terminate a grant for advancing the very purposes Congress funded. An executive agency "cannot decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken County*, 725 F.3d 255, 260 (D.C. Cir. 2013). Defendants' position reduces to the remarkable proposition that an agency may refuse to disburse congressionally appropriated funds – earmarked for a specific program and a specific purpose – because the current administration has decided that it dislikes the program's statutory objectives. That is not law; it is the improper impoundment of appropriated funds. *See Train v. City of New York*, 420 U.S. 35, 44 (1975) (President "has no power to impound" appropriated funds); 2 U.S.C. §§ 681-688 (Impoundment Control Act). As the *USDN* court explained: "When Congress appropriates funds for a specific purpose and directs the agency to distribute those funds through grants, the agency cannot circumvent that congressional directive

by terminating the grants and relabeling the congressionally-mandated activities as something Congress supposedly did not intend to fund." 2025 WL 2374528, at *31.

2. The Termination Was Arbitrary and Capricious.

The government's response to Arbor Day's arbitrary and capricious claims is equally remarkable. Rather than defend the substance of the termination decision, the government instead asserts that Arbor Day's arguments are "undeveloped" and "perfunctory" and need not be addressed. Defs.' Opp'n. at 19-20, ECF No. 31. That is not a defense; it is a concession. The government cannot identify any reasoned basis for the termination, so it declines to try.

Arbor Day's opening memorandum devotes four full pages to the arbitrary and capricious analysis, detailing eight separate deficiencies in the agency's decision-making. Pl.'s Mem. at 26-30, ECF No. 8-1. The Complaint lists these points at paragraphs 111(a) through (h). *See* Compl. at ¶¶ 111(a)-(h), ECF No. 1. Defendants' refusal to engage with these arguments does not render them undeveloped;" rather, it reflects a concession that they are unanswerable.

Under *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983), agency action is arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." The termination of Arbor Day's Grant satisfies every one of these criteria.

The termination letter does not contain any analysis of (1) the Grant's actual activities (tree planting, not DEI programs); (2) whether the Grant advanced statutory program goals; (3) the reliance interests of Arbor Day and its 79 subawardees; (4) the environmental consequences of halting programs mid-performance; or (5) whether lesser measures short of termination could address any perceived concern. *See* Pl.'s Mem. at 26-28, ECF No. 8-1; Compl. at ¶¶ 111(a)-(h),

ECF No. 1. Instead, the termination letter states that the Grant "no longer effectuates agency priorities regarding diversity, equity, and inclusion programs and activities." Donahoo Decl., Ex. A at 15, ECF No. 8-2. But the Grant's activities are tree planting, urban reforestation, hazard-tree abatement, canopy management, and dead-tree removal. *See id.* at ¶¶ 16-17. Characterizing these activities as "DEI programs" is not merely unexplained, it is irrational. An agency cannot terminate a grant by mislabeling its activities and then citing the mislabel as the basis for termination.

Further, the government has not identified evidence that the Grant involved DEI activity as opposed to tree planting. The termination letter cites no facts, references no documents, and identifies no conduct. This is precisely the deficiency that rendered the *USDN* terminations arbitrary: "The letter does not reference [the grantee's] reliance interests or anything about [the] grant that suggests the agency did anything more than locate [the grantee] via a keyword search." 2025 WL 2374528, at *31. Under *Dep't of Commerce v. New York*, 588 U.S. 752, 777 (2019), courts may not sustain agency action when the stated rationale is pretextual. Here, the disconnect between the Grant's actual activities (planting trees) and the stated basis for termination (DEI) is so stark as to compel an inference of pretext. As the *USDN* court found with respect to an identical termination: "The termination letters fail to identify any connection – let alone a rational one – between the stated basis for termination and the grants' actual activities. That disconnect renders the terminations arbitrary and capricious." 2025 WL 2374528, at *28. When an agency reverses a prior policy or commitment, it must "provide a more detailed justification" and consider the "serious reliance interests" at stake. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009 Arbor Day entered into 79 subaward agreements with organizations across 33 states. *See* Ex. A, L. Donahoo Supp. Decl. at ¶ 22. Those organizations had hired staff, commenced projects, and incurred obligations. The termination letter acknowledges none of this.

Finally, the termination letter does not explain why tree planting is inconsistent with agency priorities. It does not explain what the new priorities are or how they apply to this Grant. It provides only the conclusory assertion that the award "no longer effectuates agency priorities regarding diversity, equity, and inclusion programs and activities." Termination Letter at 1. That is not "reasoning;" it is a conclusion masquerading as an explanation. *See Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("'conclusory statements will not do; an agency's statement must be one of reasoning'"). The government's assertion that these arguments are "undeveloped" is itself a concession that it cannot rebut them. Arbor Day's opening memorandum presented these arguments in detail across multiple pages of briefing, supported by declarations and exhibits. The government simply chose not to respond to Arbor Day's detailed analysis, and this Court should not oblige its silence.

3. <u>The Government's Reliance on 2 C.F.R. § 200.340(a)(4) Is Misplaced.</u>

The government asserts that it "complied with 2 CFR 200.340(a)(4)" by issuing the termination letter. Defs.' Opp'n. at 18-19, ECF No. 31. That assertion fails on multiple grounds.

***First***, the version of § 200.340(a)(4) that authorizes termination when an award "no longer effectuates the program goals or agency priorities" did not take effect until October 1, 2024. The Grant was issued on December 18, 2023, and was governed by the prior version of the Uniform Guidance. The government cannot retroactively apply a regulatory standard that did not exist when the award was made.

***Second***, even under the current version of 2 CFR § 200.340(a)(4), termination is authorized only "pursuant to the terms and conditions of the Federal award." Under the Uniform Guidance, termination provisions must "clearly and unambiguously" be specified at the time of award. 2

C.F.R. § 200.340(b) (2024). The Grant's general cross-reference to § 200.340 did not satisfy this requirement, particularly when the subsection at issue did not exist when the award was made.

***Third***, even assuming § 200.340(a)(4) applied, compliance with that provision requires more than a one-sentence assertion that the award "no longer effectuates agency priorities." The regulation authorizes termination when an award no longer effectuates program goals or agency priorities; it does not authorize termination by decree, without explanation, evidence, or individualized assessment.

***Fourth***, the government's post-hoc correspondence from March 2025 through January 2026 does not cure the deficiency. A termination must be supported by a reasoned explanation at the time it is issued. An agency cannot terminate first and rationalize later. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (agency action must be evaluated based on the grounds articulated at the time of decision). The termination letter said nothing beyond its one-sentence DEI rationale. Post-hoc rationalizations cannot rescue it.

4. <u>The Government's "Race-Related Inequities" Characterization Is a Red Herring.</u>

The government devotes substantial effort to characterizing the Grant as a program aimed at addressing "race-related inequities" in "disadvantaged communities." Defs.' Opp'n. at 12, ECF No. 31. This characterization is misleading and reveals the arbitrary nature of the termination.

The language Defendants quote was incorporated into Arbor Day's application because the government's own Notice of Funding Opportunity ("NOFO") mandated it. The NOFO established a match waiver under which the required non-federal cost share could be waived but only for proposals meeting specific criteria. Specifically, the NOFO stated that the "[m]atch may be waived for proposals that deliver 100 percent of the funding/program benefits to disadvantaged

communities." NOFO at 6. The NOFO then required applicants seeking the match waiver to use specific equity-related language and tools:

> Applications seeking match waiver must clearly describe the scope of work to be performed in applicable disadvantaged communities, and identify online vulnerability and environmental justice equity data tools referenced to support a disadvantaged community designation, (e.g., White House Climate and Economic Justice Screening Tool (CEJST), EPA Environmental Justice and Screening Mapping Tool (EJScreen), EPA EnviroAtlas Interactive Map, Opportunity Zones), or other government sponsored vulnerability tools which inform metrics applicable to the scope of work.

In short, the government is now using compliance with its own instructions as a basis for termination. This is the definition of arbitrary and capricious. An agency cannot penalize a grantee for following the agency's own mandatory grant requirements.

Regardless of application language the government itself mandated, the actual work performed under the Grant was planting trees, removing hazard trees, managing urban canopy, and enhancing resilience—the very activities Congress funded through the CFAA and IRA. These are not "DEI programs and activities" by any reasonable definition.

5. <u>Arbor Day's Constitutional Claims Have Merit.</u>

The government argues that Arbor Day's constitutional claims are barred under *Dalton v. Specter*, 511 U.S. 462 (1994), that Arbor Day lacks a protected property interest for due process purposes, and that the void for vagueness doctrine is inapplicable when the government acts as "patron." Defs.' Opp'n. at 20-24, ECF No. 31. Each argument of these arguments fail.

***First***, Defendants argue under *Dalton* that claims "simply alleging that the President has exceeded his statutory authority" are not "constitutional claims." Defs.' Opp'n. at 21, ECF No. 31. But Arbor Day does not merely allege a statutory violation. It alleges that the Executive Branch has given itself the power to nullify Congressional appropriations by terminating duly awarded grants that fulfill statutory mandates, a constitutional violation that strikes at the heart of the

separation of powers. Congress directed the expenditure of $1.5 billion on urban forestry through the IRA. The Executive cannot simply refuse to execute that directive by terminating grants for doing what Congress funded them to do. *See In re Aiken County*, 725 F.3d at 259.

***Second***, the government contends that Arbor Day has no "protected property interest" in the Grant because discretionary grants do not create such interests. Defs.' Opp'n. at 22-23, ECF No. 31. This argument conflates the initial discretion to award a grant with the constraints on termination once a grant is awarded. The question is not whether the government was required to make the initial award. The question is whether, once the award was made and accepted, Arbor Day acquired a legitimate claim of entitlement sufficient to trigger due process protections. It did. The Grant was executed pursuant to a mandatory statutory appropriation. Arbor Day went through a competitive selection process, accepted the award, executed 79 subaward agreements, and performed under the Grant for more than a year. The government's own regulations impose substantive constraints on termination that "define the substantive predicates" for deprivation. *See Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1218 (N.D. Cal. 2017) (finding that grant recipients have legitimate property interests in appropriated funds they have accepted).

Moreover, due process requires notice and an opportunity to be heard before deprivation. *See Zinermon v. Burch*, 494 U.S. 113, 127 (1990). Here, the USDA provided no advance notice, no opportunity to respond, and no opportunity to cure. It terminated the Grant effective immediately, without any prior communication. Even if the initial grant award was discretionary, the government may not deprive a recipient of vested grant funds without *any* process.

***Third***, Defendants dismiss the *ultra vires* claim as "duplicative" of the APA claims. Defs.' Opp'n. at 21, ECF No. 31. *Ultra vires* claims serve an independent function: they provide relief even where the APA might not apply (for example, if the termination were not "final agency

action”). *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (recognizing ultra vires review as an independent ground for judicial relief). In any event, the claim requires no extended analysis at this stage because it succeeds on the same facts as the APA claims: the USDA acted beyond its lawful authority when it terminated the Grant for reasons unconnected to the Grant’s actual activities and contrary to the statutes authorizing the program.

### E. Arbor Day Will Suffer Irreparable Harm Without Relief.

The government contends that Arbor Day has failed to demonstrate irreparable harm, relying principally on *Dallas County v. Kennedy*, 2026 WL 2123225 (D.D.C. July 23, 2026), and characterizing the Donahoo Declaration as “conclusory.” Defs.’ Opp’n at 24-27, ECF No. 31. This argument misreads the record, misapplies *Dallas County*, and ignores an entire category of harm, environmental injury, that is irreparable as a matter of law.

#### 1. Arbor Day Has Suffered Irreparable Programmatic, Organizational, and Reputational Harm.

The government’s assertion that “there is no scintilla of evidence” of irreparable harm (Defs.’ Opp’n at 26, ECF No. 31) is belied by the record. The Grant funded 79 subaward agreements across 33 states. When USFS terminated the Grant, every one of those subawards was cancelled, which is not a speculative future harm, but an established fact. Seventy-nine organizations had their funding terminated, projects halted, and contractual arrangements disrupted.

Additionally, the Grant represented a substantial portion of Arbor Day’s overall programming. The termination forced Arbor Day to divert time and resources away from its mission to manage the fallout from 79 cancelled subawards. Staff resources that should have been devoted to tree planting are now instead consumed by dispute resolution, administrative claims, litigation, and finding a way to advance the organization’s mission without necessary and promised

funding. This is precisely the type of organizational injury that courts recognize as irreparable. *See USDN*, 2025 WL 2374528, at *33 ("The complete termination of the organizations' programming, impairing their central missions and damaging their reputations and relationships, and the existential threat to the ongoing operation of the organizations constitute irreparable harms.").

Arbor Day's reputation as a reliable partner to communities, municipalities, and nonprofit organizations across the country has also been damaged by the termination. Organizations that entered into subaward agreements with Arbor Day in reliance on the Grant have been left without funding and without the capacity to complete their projects. This reputational harm cannot be quantified or remedied by monetary damages. *See id.* at *34 (finding reputational harm irreparable where it was "a direct result of the termination of federal funding that plaintiffs had been using to partner with community groups and provide resources to sub-awardees").

The government's reliance on *Dallas County* for the proposition that Arbor Day's harm is "vague" and has not demonstrated that the loss of the Grant "threaten[ed] the very existence of the recipient's operations." Defs.' Opp'n at 24-27, ECF No. 31 (citing *Dallas County v. Kennedy*, 2026 WL 2123225 (D.D.C. July 23, 2026)). *Dallas County* is inapposite and distinguishable in that the plaintiff was a sub-grantee, not the direct recipient of the grant at issue. The evidence of harm was "vague," and the court found it insufficient to demonstrate that "the loss of federal funding has 'threaten[ed] the very existence of the recipient's operations.'" 2026 WL 2123225, at *5. Here, by contrast, Arbor Day is the direct grantee of a $75 million cooperative agreement with documented cancellation of 79 subawards across 33 states, diversion of staff resources, and programmatic disruption caused by the termination. *See generally* Ex. A, L. Donahoo Supp. Decl. Indeed, the *USDN* court found that this standard was met where USDN's grant represented "60% of [its] annual budget" and the organization was "fighting for [its] survival." 2025 WL 2374528,

at *33. Thus, this is not a case where the connection between the termination and the harm is "vague." The connection is not vague under any scenario; it is both direct and documented.

2. The Environmental Harm Caused by Defendants' Actions Is Irreparable.

The government's irreparable harm argument ignores an entire category of harm that is irreparable as a matter of law: environmental injury. But for the termination, Arbor Day's 79 subawardees would have planted thousands of additional trees across 33 states during the more than fifteen months since the termination. *See* Ex. A, L. Donahoo Supp. Decl. at ¶ 4. The Supreme Court has recognized that "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration." *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). This principle applies to the government's termination of Arbor Day's Grant in a number of ways.

***First***, trees that would have been planted during the 2025 and 2026 planting seasons absent the government's termination will never provide the carbon sequestration, stormwater management, air quality, and heat-island mitigation benefits they would have provided during that time period. *See* Ex. A, L. Donahoo Supp. Decl. at ¶¶ 8-9. Every passing planting season where Arbor Day's subawardees would have planted trees, were it not for the government's termination of the Grant, represents an environmental deficit that compounds over time and cannot be remedied retroactively. *Id.*

***Second***, the Grant activities included stormwater capture and groundwater replenishment, air cleaning and cooling during heat waves, and urban canopy restoration. *See* Donahoo Decl. at ¶¶ 17-18, ECF No. 8-2. These are ecosystem benefits that, when unrealized, cannot be restored by a monetary judgment. A monetary judgment cannot provide the shade, carbon sequestration, or

stormwater management that the trees would have provided if planted. *See* Ex. A, L. Donahoo Supp. Decl. at ¶ 24.

***Third***, this environmental harm extends across 33 states, affecting many communities and urban ecosystems that were identified for intervention precisely because they suffer from inadequate tree canopy cover. *Id.* at ¶¶ 21, 22. These are communities experiencing heat islands, poor air quality, and inadequate stormwater management; specific harms the Grant was designed to address and that worsen with every month that the Grant is still terminated. *Id.*

***Fourth***, environmental harm from lost tree planting is not static; it compounds. *Id.* at ¶ 9. Trees provide increasing environmental benefits as they grow, so every month of delay in planting represents a permanent reduction in cumulative environmental services over the tree's lifetime. *Id.*

In sum, the environmental harm caused by the Grant termination alone satisfies the irreparable injury requirement. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 995 (8th Cir. 2011) ("once [the environment] is harmed, the harm cannot be undone").

3. <u>Arbor Day's Efforts to Exhaust Administrative Remedies Does Not Undermine its Irreparable Harm.</u>

The government emphasizes that Arbor Day "waited over 13 months to file this suit." Defs.' Opp'n at 26, ECF No. 31. This framing is disingenuous because, as the record demonstrates, it ignores the reality that during those thirteen months Arbor Day was exhausting administrative remedies in good faith, in accordance with the APA, and at the government's own invitation.

On March 11, 2025, Arbor Day formally disputed the February 14, 2025, termination and requested reinstatement and Alternative Dispute Resolution ("ADR"). *See* Donahoo Decl. at Ex. C, ECF No. 8-2. On August 12, 2025, USFS responded with no substantive information. After this Court's decision in *USDN* on August 14, 2025, Arbor Day's counsel on September 10, 2025, demanded reinstatement in light of that ruling. *Id*. at Ex. D, ECF No. 8-2. On September 29, 2025,

USFS indicated it was reviewing the impact of *USDN*. *Id.* at Ex. E. On January 7, 2026, Arbor Day's counsel renewed the demand. *Id.* at Ex. F. Only on January 28, 2026, when USFS declared the termination "final" and refused to apply *USDN*, did it become clear that litigation was necessary. *Id.* at Ex. G. Arbor Day filed suit on May 22, 2026, approximately four months later. This timeline reflects diligent pursuit of administrative remedies, not dilatory conduct, followed by careful consideration by an organization as to whether to take the significant step of suing the USFS, a longstanding and trusted partner. Indeed, any claimed delay was not the product of indifference to the harm caused by the termination. It was the product of Arbor Day's reasonable and good faith efforts to resolve the dispute without litigation, which the government's own February 14, 2025, termination letter invited. The government's own delayed responses reflected in the timeline above, taking months to respond to each communication, substantially contributed to the timeline.

In sum, the question for the Court is not whether Arbor Day should have filed earlier; it is whether Arbor Day faces irreparable harm now, in the absence of relief, and the record demonstrates that the clear answer to that question is yes.

### F. The Balance of Equities and Public Interest Weigh in Favor of Relief.

When the government is the opposing party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Both weigh decisively in favor of injunctive relief. The D.C. Circuit has repeatedly held that "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). By contrast, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operation.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Here, as in *USDN*, the termination was

unlawful, arbitrary, and contrary to statute, and in violation of the APA. Thus, the public interest is served by enjoining it.

Defendants argue that "Arbor Day identifies only itself and 47 subrecipients, not broader public" interests. Defs.' Opp'n at 27, ECF No. 31. That is wrong. The Grant serves communities across 33 states through 79 subaward agreements. *See* Ex. A, L. Donahoo Supp. Decl. at ¶ 22. The beneficiaries are not merely Arbor Day and its subawardees; they are the millions of residents in communities where tree planting programs reduce heat islands, improve air quality, manage stormwater, and enhance quality of life. These are the very public benefits Congress intended when it appropriated $1.5 billion for urban forestry. The balance of equities overwhelmingly favors the interests of the Grant's beneficiaries over the government's interest in maintaining an unlawful termination.

Next, Defendants argue that an injunction would "disrupt the Department's review of existing grants" and "frustrate Executive discretion," invoking *Heckler v. Chaney*, 470 U.S. 821 (1985). Defs.' Opp'n at 27-28, ECF No. 31. But *Heckler* concerned the presumption against judicial review of agency *enforcement* decisions, the decision whether to bring a prosecution or enforcement action. It has nothing to do with the situation here, where an agency has affirmatively acted to terminate a congressionally funded grant in violation of the APA, federal statutes, and the Constitution. Indeed, there is no "executive discretion" to violate the law.

The Grant was issued pursuant to the CFAA and funded by the IRA to accomplish Congress's identified objectives. 16 U.S.C. § 2105(a). Reinstating the Grant does not conflict with any legitimate government interest; instead, it advances the very interests Congress legislated to protect. The government cannot claim harm from being required to comply with the law.

The government's "futility" argument fails for the reasons set forth in Section II.C above: the Grant funds were obligated at the time of termination, the de-obligation was a consequence of the unlawful termination, and vacatur restores the obligated status of the funds. The government should not be permitted to invoke the consequences of its own unlawful conduct to argue that relief would be futile.

In sum, the balance of equities weigh in favor of entering a preliminary injunction. Defendants simply cannot claim harm from being required to continue performing obligations that Congress directed them to perform. As this Court found in *USDN*: "The government suffers no cognizable harm from an injunction that merely requires it to comply with its statutory obligations and the requirements of the APA. The balance of equities tips sharply in plaintiffs' favor." 2025 WL 2374528, at *36.

**G. Any Resulting Preliminary Injunction Should Not Be Stayed.**

Defendants' bare request that any injunctive relief be "stayed pending the disposition of any appeal" should be denied because the Government cannot satisfy any of the four traditional stay factors. Under *Nken v. Holder*, 556 U.S. 418, 434 (2009), "[a] stay is not a matter of right" but "an exercise of judicial discretion," and the movant bears the burden of showing that the circumstances justify" its issuance. *Id.* at 433-34 (citations omitted). The Government has not met that burden. A stay would merely preserve the unlawful status quo rather than the last uncontested state of affairs, which was Arbor Day's fully operative $75 million cooperative agreement. This Court already denied Defendants' motion to stay these proceedings, finding no hardship or inequity from proceeding while Arbor Day submitted evidence of continuing severe and irreparable harm. *See* Order, ECF No. 29. Nothing in the Government's opposition identifies any changed circumstance warranting a different result now.

### H. <u>The Court Should Not Require Arbor Day to Post Bond.</u>

Defendants' request that any preliminary injunction be conditioned on a bond under Federal Rule of Civil Procedure 65(c). *See* Defs.' Opp'n at 29, ECF No. 31. This request should be denied because requiring a bond here would effectively deny a nonprofit organization its right to judicial review of unlawful agency action. Rule 65(c) "vests 'broad discretion in the district court to determine the appropriate amount of an injunction bond,'" including "'the discretion to require no bond at all.'" *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (quoting *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)). A bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971).

Courts confronting nonprofit plaintiffs challenging unlawful federal grant terminations or funding freezes, have consistently declined to require bonds. *See e.g., USDN* ("[r]equiring a significant bond here would impair plaintiffs' ability to seek recourse in court to vindicate alleged violations of their rights, especially considering plaintiffs' already difficult financial straits"); *National Council of Nonprofits v. Office of Management & Budget*, 775 F. Supp. 3d 100, 130 (D.D.C. 2025) ("[i]n a case where the government is alleged to have unlawfully withheld [large sums] of previously committed funds to countless recipients, it would defy logic – and contravene the very basis of this opinion – to hold Plaintiffs hostage for the resulting harm"); *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, No. 25-cv-1070 (RC), 2025 WL 1423610, at *15 (D.D.C. May 16, 2025) ("Where the risk of financial harm is speculative at best and where a bond would have a chilling effect on access to justice, the balance of equities firmly supports waiving the bond.").

The same reasoning applies here: Arbor Day is a nonprofit organization that has been deprived of $75 million in congressionally appropriated federal grant funding, and Defendants identify no cognizable monetary harm they would suffer from an injunction requiring compliance with their statutory obligations and restore a grant that Congress funded for the express purpose of urban forestry, carbon reduction, and environmental improvement. *See* Pub. L. 117-169, § 23003(a)(2); 16 U.S.C. § 2105. Arbor Day respectfully requests that the Court waive the bond requirement entirely or, at most, impose a nominal bond consistent with *Elev8 Baltimore, Inc. v. Corporation for National & Community Service*, 804 F. Supp. 3d 524 (D.D.C. 2025) (imposing $100 bond per plaintiff where risk of government harm was remote and Congress specifically contemplated the appropriated funds would be spent as directed by the injunction).

## III. CONCLUSION

For the foregoing reasons, and those set forth in Arbor Day's opening memorandum in support of its Motion for Preliminary Injunction (ECF No. 8-1), Arbor Day respectfully requests that the Court grant its motion and enter a preliminary injunction (1) enjoining Defendants from maintaining or effectuating the termination of the Grant; (2) ordering Defendants to reinstate the Grant and restore all previously obligated funding; and (3) ordering Defendants to resume performance of all obligations under the Grant pending final resolution of this action.

DATED this August 13, 2026.

Respectfully submitted,

BASS, BERRY & SIMS

/s/ Erin Palmer Polly
Erin Palmer Polly (*pro hac vice*)
Richard W. Arnholt (DC Bar# 489163)
Adam R. Briscoe (DC Bar# 1657531)
1201 Pennsylvania Ave NW, Suite 300
Washington, DC 20004
(202) 827-2950
Erin.Polly@bassberry.com
RArnholt@bassberry.com
Adam.Briscoe@bassberry.com

Margaret V. Dodson (*pro hac vice*)
21 Platform Way South, Suite 3500
Nashville, TN 37204
(615) 742-7712
Margaret.Dodson@bassberry.com

*Counsel for Plaintiff The National Arbor Day Foundation*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 13, 2026, a true and correct copy of the foregoing was electronically filed with the Court using the Court's Electronic Case Filing system. I understand notice of this filing will be sent to all parties by operation of the Court's system, and parties may access this filing through the Court's system. In addition, I served a courtesy copy of the foregoing by electronic mail on:

Catherine J. Malycke
Dimitar Georgiev-Remmel
Assistant U.S. Attorney
Civil Division, U.S. Attorney's Office
601 D St., NW, Washington, D.C. 20530
(202) 809-3495
Catherine.Malycke@usdoj.gov
Dimitar.Georgiev-Remmel@usdoj.gov

/s/ Erin Palmer Polly
Erin Palmer Polly (*pro hac vice*)
21 Platform Way South, Suite 3500
Nashville, TN 37204
(615) 742-7712